JOHN TAYLOR, Plaintiff-Appellee, *v.* POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.

First District (3rd Division)    No. 76-1290

Opinion filed June 28, 1978.

William R. Quinlan, Corporation Counsel, of Chicago (Mary Denise Cahill, Assistant Corporation Counsel, of counsel), for appellants.

Herbert Barsy, of Lipnick, Barsy & Joseph, of Chicago (William J. Martin, Ltd., of counsel), for appellee.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The Police Board of the City of Chicago (the Board), found that patrolman John Taylor violated rules of the Chicago Police Department and discharged him from the force. Taylor petitioned the circuit court of Cook County to review the decision under the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*). Finding that the order was against the manifest weight of the evidence, the court reversed the Board. By this appeal, the Board seeks to reinstate its order, arguing that the order is supported by the evidence and, in the light of Taylor's conduct, that there was cause to dismiss him from the force.

On January 2, 1973, Taylor, while on duty, shot 17-year-old Derrel McKinney. McKinney died as a result of the gunshot wound. Charges against Taylor for his actions relating to McKinney's death were filed with the Board. After an administrative hearing, the Board, on September 25, 1975, discharged Taylor, finding that he violated Rules 8, 11, 14 and 38 of the Police Department.

Taylor did not testify at the hearing. His version of the events was placed in the record through the introduction of statements he gave to the police shortly after McKinney's death and excerpts from testimony he

gave in a 1974 Federal civil rights suit filed by McKinney's parents. According to Taylor, on the night of January 1-2, he and another officer were on patrol in an unmarked vehicle. About midnight they began to follow a car occupied by two juveniles. They suspected that the driver (later identified as McKinney) and the passenger (later identified as Jerry Cowan, McKinney's neighbor) were curfew violators. McKinney, apparently to elude the unmarked vehicle, increased the speed of his car to 30 miles per hour and drove down an alley. The police continued pursuit. After both cars turned on to a street, the police switched on emergency lights. McKinney stopped the car, got out and ran towards a gangway between two single family residences. Taylor followed him, shouting "Stop, police." The other officer stayed with Cowan.

According to Taylor, as he approached McKinney in the gangway, McKinney turned, pushed him off balance and ran down the gangway toward the alley. He did not see any weapon on McKinney. Taylor stated he followed McKinney, leaping, as McKinney had done, over a gate, again shouting "Stop, police" and drawing his gun as he entered the backyard. Still in pursuit, Taylor attempted to jump over a second gate which led to the alley. It was 45 inches high and wired shut. Taylor did not clear the gate; he fell back and the gun discharged. In one statement he said the gun fired when his hand hit the gate; in another he said the gun fired when he hit the ground. He said he may have, unintentionally, pulled the trigger. He got up, cleared the gate, and found McKinney about 15 feet down the alley, face down, with a bullet wound in his back. Taylor returned to the police car to summon help. The gangway and backyard, it turned out, belonged to the house in which McKinney lived with his family. Taylor said he pursued McKinney because he suspected McKinney had committed curfew and traffic offenses and "for whatever reason McKinney ran."

At the Board hearing three persons testified that they heard the gunshot. Valerie Wilson, McKinney's sister, said that at the time of the shooting she was sitting in the dining room of her house near the window which directly abutted the gangway down which McKinney and Taylor ran. She testified that she heard running footsteps, a clang of a gate, more footsteps and a gunshot. She heard no voices. On cross-examination Wilson said she gave a statement to the police concerning her brother's death. However, no such statement was found.

Frank Pittman, who lived in the house on the other side of the gangway, testified that at the time he was in the bathroom in his basement. Through a window which opened on to the gangway, he heard footsteps, a wooden thud, more running footsteps, a pause and a gunshot. He did not hear any voices, either. Pittman recalled giving several statements to the

police concerning the incident, although the record reflects only one such statement was given.

Esther Pittman, Frank's wife, was upstairs in the Pittmans' house in a bedroom on the side of the house near the gangway. She testified she heard footsteps, a noise as if someone was kicking a door, another set of footsteps, which stopped at her bedroom window, then a shot. She, too, heard no voices. On cross-examination some of the testimony she gave at the coroner's inquest was read to her. She was told that at the inquest she testified she looked out the bedroom window at the sound of the shot. There were also statements read which indicate she heard a gate clang in addition to the noises she described at the Board hearing. Esther denied looking out her bedroom window after the shot and was unclear whether she heard a gate. It was stipulated that she had testified at the inquest to those facts. No part of the actual inquest transcript was incorporated into the Board record.

A report of an examination of Taylor's gun by firearm's expert, Earl Warner, was introduced into the record. It stated that unless Taylor pulled the trigger, the safety devices on his gun would prevent it from firing, even if it struck something. If the gun was not cocked, the pressure required to pull the trigger and fire it was from 10½ to 11 pounds; if cocked, 3 to 3½ pounds of pressure was sufficient. Warner testified to these facts at the hearing.

On this record, the Board discharged Taylor. The circuit court reversed the order of the Board. In order to determine whether the Board's ruling was proper, we must examine three questions: (1) does Taylor's alleged conduct fall within the prohibitions of the Police Department Rules; (2) does the record support the facts found; and (3) assuming that Taylor's conduct did violate Police Department Rules, were these violations "cause" for his dismissal.

■■ An administrative body's interpretation of its own rules, as long as the interpretation relates to the agency's power, is entitled to a presumption of validity. (See *Scheffki v. Board of Fire & Police Commissioners* (1974), 23 Ill. App. 3d 971, 973, 320 N.E.2d 371, 373.) This deference is accorded the Board because, as part of the executive branch of the government, it has both the responsibility and expertise in matters relating to the enforcement of standards which concern maintenance of discipline and morale within the Department. (*Nolting v. Civil Service Com.* (1955), 7 Ill. App. 2d 147, 129 N.E.2d 236.) A reviewing court's obligation is only to determine whether the Board's interpretation of its own rules has a reasonable basis in law. *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 346 N.E.2d 212; see also *Nolting*; *Ranquist*.

The Board decided that Taylor's conduct on the night of McKinney's death violated, among others, Rules 8, 38 and 11 of the Police Department. Rule 8 prohibits an on duty officer's maltreatment of an individual; Rule 38 prohibits the unnecessary use or display of a weapon by an officer; Rule 11 prohibits a police officer from acting inefficiently and incompetently.

The Board concluded that Taylor's actions in drawing his gun while in pursuit of McKinney constituted unnecessary use or display of a weapon; it went on to find that such conduct under the circumstances falls within the concept of "maltreatment." Taylor, on the other hand, asserts that his judgment in drawing his gun while in pursuit of a fleeing suspect, down a darkened gangway, at midnight, was justified. He states that as a police officer he had a duty and a right to stop McKinney for questioning and possible arrest because of McKinney's evasive conduct, the alleged traffic violations and McKinney shoving him. As such, Taylor suggests, his use of his gun was necessary and not maltreatment of McKinney.

■■■ In order for this court to characterize Taylor's conduct as justified it must replace the Board's assessment of on-duty police procedure with its own. Such a substitution of judgment is not within the competence of a reviewing court when the interpretation given the rule in question by the administrative body which adopted it is a reasonable one. (*Nolting.*) Taylor stated his only reason for chasing McKinney that night was to question or arrest him for possible curfew and traffic violations. While McKinney's flight down the gangway might have prompted a variety of suspicions, there is no evidence that it threatened bodily harm to Taylor or anyone else or that Taylor was attempting to stop him on a belief that McKinney was a fleeing felon. The record, based on Taylor's statements, is bereft of any reason for Taylor's action in drawing his gun; the Board was left to infer it. While a court trying the case *de novo* might have drawn different inferences and come to a different conclusion, on the record in this case, it was reasonable to conclude that Taylor's conduct in drawing, displaying and using his revolver was unnecessary and a violation of Rule 38. Further, in consideration of the special need for the exercise of restraint by a police officer when dealing with the public in an official capacity (see *Oratowski v. Civil Service Com.* (1954), 3 Ill. App. 2d 551, 123 N.E.2d 146), it is not without the bounds of reason that such conduct against a juvenile traffic offender can be construed as maltreatment of a person in violation of Rule 8.

■■ The Board also found that Taylor's attempted vault of the wired gate with a drawn revolver in his hand was incompetent and inefficient performance of his duty in violation of Rule 11. Taylor characterizes this attempt to leap the fastened gate as consistent with his duty to stop McKinney. He had no time, he argues, to unwire the gate or holster his

gun. Under the circumstances, he insists, his judgment was proper and his conduct competent police work. Evidence showed that Taylor's weapon would not fire unless the trigger was pulled with considerable force. We cannot say that trying to leap a gate, almost four feet high, with a finger on the trigger of a loaded weapon, is not incompetent and inefficient police work in violation of Rule 11, as the Board decided.

Focusing on different conduct, the Board found that Taylor violated Rule 14 by making a false report when he said that he called "Stop, police" while in pursuit of McKinney. According to Taylor, he gave McKinney two warnings. The testimony of the Pittmans and Wilson is that they did not hear any voices. The Board chose not to believe Taylor, concluded that he did not give McKinney the warning and that he violated Rule 14 when he said he did. If the record supports the Board's finding that Taylor did not make the warning, its determination that he violated Rule 14 is valid.

■■ The findings and conclusions of the Board on questions of fact must be considered *prima facie* true and correct (Ill. Rev. Stat. 1975, ch. 110, par. 274); this means that the function of a reviewing court is limited to ascertaining whether the findings are against the manifest weight of the evidence. (*Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 269 N.E.2d 713.) In order to be able to reject the Board's findings a

> "* * * reviewing court must be able to say that all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that the finding is erroneous." (*Daniels v. Police Board* (1976), 37 Ill. App. 3d 1018, 1023, 349 N.E.2d 504, 508.)

Where, as here, testimony of witnesses conflicts, it is the Board's duty to evaluate credibility and resolve conflict. (*Ranquist v. Stackler* (1977), 55 Ill. App. 3d 545, 370 N.E.2d 1198.) A reviewing court may not reweigh the evidence to overturn the Board's evaluation of credibility because it finds an opposite conclusion might be reasonable. (*DeGrazio v. Civil Service Com.* (1964), 31 Ill. 2d 482, 202 N.E.2d 522.) The court may only determine if the evidence, as weighed by the Board, supports its findings. *Daniels.*

Taylor argues that the Board must accept his version of the incident because the credibility of the witnesses who contradicted him was seriously damaged. He highlights parts of the record which demonstrate the Wilson and the Pittmans' bias because of their relationship to McKinney, the lapse of time between McKinney's death and their testimony, the inconsistencies relating to the number of statements they gave to authorities and the apparent variances in Esther Pittman's testimony. He suggests that these discrepancies are comparable to the misidentifications in *Daniels* which caused the reversal of the findings of

the Board in that case. There a police officer charged with attempting to extort money from shopkeepers was described at the Board hearing by witnesses as being in plain clothes and driving a marked police car. Documentary evidence established that on the night of the alleged extortion the officer was in uniform and driving an unmarked police car.

■■ Unlike *Daniels,* here there has been no direct impeachment by documentary evidence of the testimony of Wilson and the Pittmans. The conflict in evidence in this case arises solely from the differences in the recollections of the witnesses and Taylor. The mere fact that the Board based its decision on testimony which is conflicting is not a sufficient basis to reverse its findings. (*Flynn v. Board of Fire & Police Commissioners* (1975), 33 Ill. App. 3d 394, 342 N.E.2d 298.) While this record may contain discrepancies which detract from the reliability of some of the testimony of the Pittmans and Wilson, the Board could reasonably find that none of the discrepancies refuted the essence of their testimony that Taylor did not, as he said he did, call out his office to McKinney. The evidence is sufficient to support the Board's decision that a false report was made to the Police Department. The Board's finding of a violation of Rule 14 is not against the manifest weight of the evidence.

■■ ■ Since the Board properly found that Taylor's conduct violated Rules 8, 11, 14 and 38, we must examine whether these violations constitute cause for dismissal. The finding that an officer violated Police Department rules alone does not empower a Board to dismiss him. (See *Kreiser v. Police Board* (1977), 69 Ill. 2d 27, 370 N.E.2d 511.) The Board can discharge an officer from the force only if that officer's conduct constitutes "cause" for dismissal. (Ill. Rev. Stat. 1975, ch. 24, par. 10—1— 18.1.) This is defined as a substantial shortcoming which makes the continued employment of the actor detrimental to the discipline and efficiency of the service, "* * * something which the law and a sound public opinion recognize as a good cause for * * * [the officer] not longer occupying the place." (*Fantozzi v. Board of Fire & Police Commissioners* (1963), 27 Ill. 2d 357, 360, 189 N.E.2d 275, 277.) The Board's determination of cause can only be overturned when the charges against the officer are so trivial as to be unreasonable and arbitrary, and his dismissal unrelated to the requirements of the service. *Kreiser.*

■■ The use of a deadly weapon by a police officer, in the course of his duty, goes to the core of the discipline requirements in the Police Department. A Board's decision relating to an officer's conduct with and use of a gun while on duty, far from being trivial, is closely related to these requirements and is a substantial component of the Board's responsibility. Incompetent use of a deadly weapon, which resulted in death, is a reasonable basis for dismissal. There is no indication that the

Board was acting arbitrarily. Scrutiny of the record discloses no evidence that under similar circumstances other officers would not have faced identical disciplinary action.

The Board's decision that Taylor violated Rules 8, 11, 14 and 38 was within the scope of its authority; it correctly interpreted these police department rules and the evidence supports its findings. Therefore, the decision of the circuit court is reversed and the order of the Board discharging Taylor from the police force is reinstated.

Reversed.

SIMON and McGILLICUDDY, JJ., concur.