HARVEY MARGULIS, Plaintiff-Appellee, v. ILLINOIS RACING BOARD, Defendant-Appellant.

First District (5th Division)   No. 83—2571

Opinion filed March 8, 1985.—Rehearing denied April 30, 1985.

Neil F. Hartigan, Attorney General, of Springfield (Kathryn A. Spalding, Assistant Attorney General, of Chicago, of counsel), for appellant.

Edward V. Hanrahan, of Chicago, for appellee.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiff, Harvey Margulis, owned the winning horse, C. C. Sun, in whose post-race urine sample an unauthorized "foreign substance," the drug procaine, was discovered. For this reason, defendant Illinois Racing Board (Board) disqualified the horse, canceled and redistributed the winning purse. Plaintiff appealed to the circuit court, which reversed the Board's decision. The circuit court held that the applicable State statute and Board rules had not been violated because the quantity of the drug procaine in the horse did not have a "therapeutic effect" on the horse during the race. This appeal followed. We reverse.

The Board contends before this court that the rules of the Racing Board (1) prohibit the presence of a foreign substance in a horse during a race, regardless of its effect on the horse during the race; (2) disqualify a winning horse in which a foreign substance is found; and (3) require redistribution of the winning purse, all of which is de-

signed to promote and protect fair and honest horse racing.

Section 37—36(a) of the Illinois Horse Racing Act of 1975 prohibits the administration to any horse of "a hypnotic, narcotic, stimulant, depressant or any chemical substance which may affect the speed of a horse at any time, except those chemical substances permitted by ruling of the Board ***." Ill. Rev. Stat. 1981, ch. 8, par. 37—36(a).

Illinois Horse Racing Board Rule C9.4 states:

> "No horse participating in a race shall carry in its body any foreign substance (irrespective of when administered or injected), except as provided in Rule C9.9 (a)."

Section (a) of Rule C9.9, entitled "Permitted Use of Foreign Substances," sets forth the limited exceptions under which a nonsteroidal anti-inflammatory drug may be present in a horse at controlled levels, and the rule sets forth the external liniments and leg paints which may be applied to a horse. Any "caine" derivative (such as a procaine) is expressly prohibited. Rule C9.9(a) states in part:

> "(a) Non-steroidal Anti-Inflammatories (NSAID).
>
> Only one non-steroidal anti-inflammatory drug (NSAID) may be present in a horse's body while it is participating in a race. The presence of more than one NSAID at any test level is forbidden. The only foreign substance which now meets the criteria established in Rule C9.8 ["Future Additions to Permitted List"] is phenylbutazone.
>
> * * *
>
> (b) The following foreign substances may be administered externally to a horse entered to a race: leg paints and liniments which do not contain ethyl-aminobenzoate, or do not contain any "caine" derivatives, and which can be applied topically without penetrating the skin."

Future additions of authorized drugs are provided for in Rule C9.8, which authorizes the Board to permit the use of a foreign substance "of accepted therapeutic value *** as prescribed by a veterinarian when test levels and guidelines for its use have been approved by the Board ***."

On October 4, 1982, plaintiff Harvey Margulis' horse, C. C. Sun, finished first in the second race at the Hawthorne Race Course in Cicero. On November 4, 1982, the Board of Stewards, who, along with the Illinois Horse Racing Board, are charged with regulating Illinois horse racing (Ill. Rev. Stat. 1981, ch. 8, par. 37—3.19) declared C. C. Sun disqualified and ordered redistribution of the winning purse. This finding was based on a report from the Illinois Racing Board laboratory, the official testing agency of the Board, that a urine sample

from C. C. Sun showed the presence of procaine. Plaintiff appealed this decision to the Board on November 8, 1982, and a *de novo* hearing was convened on March 7, 1983.

In the interim, a portion of the urine sample taken from C. C. Sun was sent to the laboratory at the University of Kentucky in Lexington. Dr. J. W. Blake, associate professor in the department of veterinary science at the university, found that the sample contained 23 nanograms of procaine per milliliter of urine. A nanogram is one billionth of a gram. A gram equals one-twenty-eighth of an ounce.

At the Board hearing, the parties stipulated that the Board's lab report and Blake's lab report were accurate, that the urine sample contained procaine, that the procaine was administered to the horse by Steven Seabough, D.V.M., under emergency conditions (because the horse was choking) and that there was no evidence that the procaine came from any other source. Also stipulated was the fact that the Illinois State veterinarian had advised all horse owners and trainers in a publication (an "overnight" sheet) on October 27, 1982, that any horse receiving any products containing a local anesthetic (such as procaine) may test positive to those medications for up to 10 days.

The record next shows that the Board rested its case after submitting the above-mentioned stipulation and seven exhibits, four of which were "mutually agreed upon." Those exhibits included urine sample lab reports and the Board of Stewards ruling.

Presenting his case, plaintiff asserted that Rule C9.4 must be interpreted to require the additional finding that the drug had some effect on a horse's performance and, alternatively, absent such a finding, the application of Rule C9.4 violated plaintiff's constitutional right to due process of law. Plaintiff then called Dr. Steven Seabough to testify.

Dr. Seabough had practiced veterinary medicine at standardbred race tracks in the Chicago area since 1973. He testified that he administered procaine penicillin and other drugs to plaintiff's horse, C. C. Sun, on September 27, 1982, under emergency conditions because the horse had choked on a bolus of hay. The procaine reduced the horse's pain at the site of the injection. Dr. Seabough acknowledged that the amount of water consumed by a horse would affect the amount of drugs found in the horse's urine. He further agreed that kidney disease, temperature and humidity affect urine secretion. Dr. Seabough said that because these variable factors affect the amount of drugs in urine samples, the attempt to quantify drugs in urine was an unreliable test of the therapeutic effect of drugs on a horse's racing performance.

In Dr. Seabough's opinion, the therapeutic effect of the procaine that was administered to C. C. Sun would have lasted less than 24 hours. Dr. Seabough based his opinion upon his experience and on a May 1977 article written by Drs. Tobin and Blake which appeared in The Journal of Equine Medicine and Surgery. The article, which was admitted into evidence, stated that procaine may appear in urine samples long after the blood is free of the drug and that blood samples should be analyzed to determine the actual level of drugs in a horse. The article acknowledged that procaine is unstable in equine plasma.

In Dr. Seabough's opinion, procaine is administered only in combination with penicillin or another antibiotic. He testified that procaine may appear in a sample for five days and will remain in the horse's system forever. He also said that a horse should not be raced for five days following the administration of procaine and that the five-day period was based on unwritten guidelines given by State veterinarians. The 1977 Tobin and Blake article stated that procaine may test positive for seven days.

Testifying further Dr. Seabough said that C. C. Sun was raced under the "five day" standard. He noted that the October 27, 1982, "overnight" sheet from the State veterinarian contained an announcement that procaine may show up seven to 10 days after administration. Discussing the lab report from the University of Kentucky, Dr. Seabough stated that in his opinion the procaine would have had no therapeutic effect on C. C. Sun.

Next, the Board hearing officer admitted into evidence plaintiff's affidavit of Edward Umans, D.V.M., who was the regular veterinarian for C. C. Sun. Dr. Umans shared the opinion of Dr. Seabough that the therapeutic effect of a single dose of procaine penicillin would not last beyond 24 hours and that 23 nanograms per milliliter of procaine in the urine of a horse would have no effect on a horse's racing performance. Also admitted into evidence was plaintiff's affidavit of John L. McDonald, director of the Illinois Racing Board laboratory. In the affidavit, McDonald stated that he agreed with the article in The Journal of Equine Medicine and Surgery, which also stated that equine procaine is not stable in plasma. The affidavit expressed McDonald's opinion that 20 nanograms per milliliter of procaine could indicate a proper administration of procaine penicillin. McDonald further stated in his affidavit that that amount could also be indicative of an illegal dose administered four to eight hours before the collection of the sample.

Next, plaintiff called Thomas N. Phillips, D.V.M., to testify. Dr. Phillips had specialized in equine veterinary practice for 20 years and

had taught at the University of Illinois College of Veterinary Medicine for approximately nine years. He stated that normally, procaine penicillin is administered once daily for four to seven days if there is an active infection in a horse. In his opinion, a single dose of procaine penicillin administered seven days before a race would have no effect on a horse's performance. Dr. Phillips was of the opinion that if the horse had an inflammation which was reduced by the administration of the drug, the drug would affect racing performance. He agreed that there is a very large difference between the amount of procaine excreted by horses through the urine. Thus, an equal amount of procaine administered to two horses may result in 23 nanograms per milliliter in one and 207,000 nanograms per milliliter in another.

On April 21, 1983, the Board found that the presence of procaine in the post-race urine sample taken from C. C. Sun violated Board rules and ordered redistribution of the purse. In its written order, the Board stated in part:

"Counsel for Margulis has argued that the procaine found in C. C. Sun had no therapeutic effect on the horse's performance. Based on this record, we can not make such a determination.

We do know that procaine penicillin was administered to the horse seven days before the race.

\* \* \*

In addition, given the present state of the art in post-race testing of equine plasma and urine, there are no objective criteria of determining whether procaine in such test samples has had a therapeutic effect on the horse during a race.

The rules prohibit the presence of any foreign substance in a post-race urine sample of a horse. These rules are designed to create objective enforceable criteria for the eligibility of all horses. If we adopted Margulis' argument, the state would be required in each case to prove that the drug found affected the outcome of the race. Winners would be determined not by the speed of the horses but by the opinions of chemists and veterinarians and the court room skills of opposing counsel.

Rule C9.19(b) provides that a purse shall be redistributed if a laboratory report of a foreign substance is accurate. Here, it is stipulated that two post-race testing laboratories have accurately reported a foreign substance in the post-race urine sample of C. C. Sun. The horse carried procaine in its body while participating in a race and is therefore ineligible to win the race."

Plaintiff then filed a complaint for administrative review in the circuit court of Cook County, which reversed the Board's decision. The court stated that a finding of "therapeutic effect" upon the horse must be read into the Board rules prohibiting the presence of foreign substances in the horse while racing. The court found that the procaine present in C. C. Sun during the race had no therapeutic effect.

██ The Board first contends before this court that its rules, set forth above, mandate that the presence of *a* foreign substance is sufficient to disqualify a horse from a race and that contrary to the circuit court's ruling, there is no requirement that the substance *must have affected the horse's performance during the race.* Plaintiff, on the other hand, asserts that the Board did not confine itself to its limited authority under the Illinois Horse Racing Act of 1975, which, according to plaintiff, is to make rules which forbid the presence of only those substances which may affect the speed of a horse. Plaintiff argues further that the trial court's ruling that the procaine had no therapeutic effect was correct. Plaintiff urged that Board Rules C9.2(d) and C9.4 are overbroad. Rule C9.2(d) provides:

"Foreign Substances means all substances except (a) those which exist naturally in the untreated horse at normal physiological concentrations or (b) substances, or metabolites thereof, which are contained in equine feeds or feed supplements but do not contain any pharmacodynamic and/or chemotherapeutic agents."

Rule C9.4 prohibits a horse from racing with *any* foreign substance in its body. Plaintiff argues that this rule is also unconstitutional because it is overbroad. We do not agree.

In this court's recent decision in *Kline v. Illinois Racing Board* (1984), 127 Ill. App. 3d 702, 469 N.E.2d 667, the plaintiff's horse, like the horse C. C. Sun in the instant case, was disqualified from a race for carrying a foreign substance (scopolamine) in its body. Like the plaintiff here, the plaintiff in *Kline* argued that the applicable Board Rule, C9.4, should only be applied to foreign substances which are found to affect a horse's racing performance. The plaintiff in *Kline* contended that Rule C9.4 was "applied under an unreasonable and unconstitutional presumption, *viz*, that proof of the 'mere presence' of a foreign substance in a horse results in the Board's taking as true the further fact that by virtue of the presence of the substance 'the horse thereby had an unfair advantage over its competitors.' " (127 Ill. App. 3d 702, 705.) This argument was rejected by the court in *Kline* and will be rejected in the case at bar also. The court stated in *Kline*:

"[W]e agree with the Board that plaintiff's suggested rule, if adopted, would necessarily result in almost endless conflicts before the winner of a race could be declared; first between chemical and medical experts \*\*\*, and then between legal experts appearing before the courts. Endless debates as to whether the speed of a particular horse was 'affected' by a given concentration of a certain drug during a given race under prescribed conditions would not, in our opinion, enhance the interests of the Illinois horse racing industry, nor its patrons. The essence of horse racing is the immediate finality of declaring the winner." 127 Ill. App. 3d 702, 708.

Based on *Kline*, we disagree with the trial court's determination in the case at bar that a winning horse is disqualified only where it is shown that the drug found in the horse had some therapeutic effect upon the horse's performance. This interpretation contravenes the plain language of rule C9.4, as well as principles of statutory construction. Where the language of a statute or regulation is specific and unambiguous, there is no need for judicial interpretation or construction. (*Illinois Racing Board v. Arlington Park Thoroughbred Race Track Corp.* (1979), 76 Ill. App. 3d 289, 292, 395 N.E.2d 93.) The Board's rules in the instant case are clear and unambiguous. Rule C9.4 prohibits the presence of *any* foreign substance irrespective of when administered or injected. There is no requirement that the foreign substance in the horse must be shown to have affected the horse's performance. Rather, the rules mandate that *the mere presence of the drug* is sufficient to order redistribution of the purse.

An examination of the record in the case before us supports the Board's decision. The record shows that no objective, absolute method exists to quantify the amount and effect of procaine in a horse during a race. As admitted by plaintiff's witness, Dr. Steven Seabough, several variables affect the concentration of the drug in the post-race urine sample. The amount of water a horse drinks can dilute the amount of procaine present in the sample. Weather conditions which affect how much the horse sweats as well as the condition of the horse's kidneys bear upon the quantification. Thus, the test sample may or may not show a therapeutic effect or impact upon the horse's performance in the race. More important, the quantification of procaine in the urine sample, even if accurate, may have no relation to the amount of procaine in the horse's plasma. As acknowledged by plaintiff's witness Phillips, there is "a very large difference between the same horse and the same amount of procaine and between one horse and another on the amount excreted and picked up in the

urine." Counsel for the Board cross-examined Phillips on this point and showed that the 1981 book *Drug Performance Testing* by Dr. Tobin stated that there was a 9,000-fold possible range in urinary procaine concentrations in a single fixed plasma level of the drug. Thus, based upon C. C. Sun's urine sample of 23 nanograms of procaine per milliliter, the amount of procaine present in the horse's plasma could be anywhere from zero nanograms to 207,000 nanograms (23 nanograms X 9) per milliliter.

Thus, the Board cannot permit the presence of drugs in horses on a post-race determination that the drug did not affect the horse's race performance. As the Board stated in its order, if such were allowed, a winner of a race would be determined not by the speed of the horse, but by the opinions of chemists and veterinarians and the courtroom skills of counsel. Such a result is incompatible with the Board's duty to protect the integrity of horse racing and public confidence in the sport. The Board has rationally chosen to prohibit the presence of *all* drugs except those drugs that meet the standards set forth in Rules C9.8 and C9.9.

Plaintiff's reliance on the Florida Supreme Court's decision in *Simmons v. Division of Pari-Mutuel Wagering* (Fla. 1982), 412 So. 2d 357, is misplaced. In that decision, the Supreme Court of Florida upheld a lower court's decision that the portion of the Florida Racing Act which prohibited "any substance which is foreign to the natural horse" was not rationally related to the objectives of the State statute and was therefore unconstitutional. (412 So. 2d 357, 359.) Based on that decision, plaintiff in the case at bar argues that the Illinois Board rules and the Florida statute are identical and that the Board rules are therefore invalid. Plaintiff's argument, however, is based on plaintiff's cursory reading of the Florida and Illinois racing rules and plaintiff's failure to distinguish the two. The Florida rule prohibited the presence of *any* substance which is foreign to the horse. Under that statute the presence of such innocuous substances as vitamins, flavoring agents, solvents and feed supplements could conceivably subject a racing horse to disqualification. The Florida Supreme Court therefore found that such a result was not related to the State's objective of protecting the integrity of the sport.

Illinois Horse Racing Board Rule C9.2, however, specifically *permits* such substances. Also, Rule C9.8 provides for the orderly amendment to the rules once certain testing criteria are met. By enumerating the permitted substances in the rules, the Board thus fairly apprises all interested persons that other substances in a horse will not be permitted. This is rationally related to the State's interest in

protecting the integrity of horse racing.

■■ We further agree with the Board's disqualification of the horse and the redistribution of the prize money when the presence of such drugs in the horse is established. Our supreme court has stated:

"It is beyond question that the [Illinois Racing] Board possesses extensive control over the manner in which races are conducted and over the qualifications and eligibility of the various participants, so as to assist the Board in insuring that the racing itself and the pari-mutuel betting permitted by the Act will be conducted honestly." *Chicago Division of the Horsemen's Benevolent & Protective Association v. Illinois Racing Board* (1972), 53 Ill. 2d 16, 19, 289 N.E.2d 421.

The Board rules, designed to protect the integrity of the sport, public confidence in racing and the health of race horses, are rationally related to these goals.

In *Edelberg v. Illinois Racing Board* (7th Cir. 1976), 540 F.2d 279, the plaintiffs initiated an action under 42 U.S.C. sec. 1983 (1976) alleging that Board Rule 317 (now Rule C9.19), which called for the forfeiture of prize money if drugs were found in the horse's post-race sample, violated their due process rights. In language applicable in the instant case, the court in *Edelberg* described Rule 317:

"Rule 317 provides that, upon determination that a positive laboratory report finding the presence of drugs is accurate, all purse money won by the drugged horse shall be forfeited and redistributed among the remaining horses in the race. ***. In other words, *a condition precedent to receiving the purse money is that the winning horse be free of certain drugs. There is no possible defense once the presence of an illegal drug is established.* Whether the owners took every precaution against the possibility of the horse being drugged or whether the owners permitted the horses to be drugged is irrelevant in determining who receives the purse money. *The rule provides for a hearing at which time the adequacy of the laboratory tests can be challenged. If the laboratory test survives technical challenge or if the report is not contested the purse money is forfeited and redistributed among the remaining horses in the race according to their order of finish."* (Emphasis added.) 540 F.2d 279, 282.

The *Edelberg* court not only held that Rule 317 created a condition precedent necessary to insure a legitimate race, it further ruled that the possession of the prize money is conditioned upon the determination that the winning horse *complied with the established rules.* (520

F.2d 279, 284.) The court rejected the argument that the presumption created by Rule 317 violated due process and held that the presumption "that drugged horses substantially affect performance in a race is a rational, reasonable, and, we believe, permissible conclusion." (540 F.2d 279, 286.) The constitutionality of Rule 317 was thus upheld. Based on the court's reasoning in *Edelberg*, we find that the Board's rules in the case at bar prohibiting the presence of *any* foreign substance in a horse and requiring purse redistribution upon the finding of such presence are constitutionally sound.[1]

For the reasons stated above, the judgment of the circuit court of Cook County reversing the Illinois Racing Board was erroneous and is therefore reversed. The findings and decision of the Racing Board are affirmed.

Reversed.

MEJDA, P.J., and LORENZ, J., concur.

---

[1]Other jurisdictions have enacted rules concerning the penalty to be imposed if drugs are found in the winning horse. See *Hacker v. Pennsylvania Horse Racing Com.* (1979), 46 Pa. Commw. Ct. 263, 405 A.2d 1379; *O'Daniel v. Ohio State Racing Com.* (1974), 37 Ohio St. 2d 87, 307 N.E.2d 529; *Kentucky State Racing Com. v. Fuller* (Ky. 1972), 481 S.W. 2d 298; and *State ex rel. Spiker v. West Virginia Racing Com.* (1951), 135 W. Va. 512, 63 S.E. 2d 831.