INFINITY STABLES, INC., *et al.*, Appellees, v. THE ILLINOIS RACING BOARD, Appellant.

First District (3rd Division)   No. 84—3011

Opinion filed December 18, 1985.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Kathryn Spalding, Assistant Attorney General, of Chicago, of counsel), for appellant.

Thomas J. Cisar, of Oak Brook, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

After the racehorse Chris Time Pick won four races and Poco Perry won a fifth race, defendant Illinois Racing Board discovered an unauthorized drug in the two horses, which were owned by plaintiff Infinity Stables, Inc., and trained by plaintiff Susan D. Janisch. The Board stewards disqualified the horses, redistributed the purses, imposed fines and suspended Janisch's license. Plaintiffs appealed to the Board, which conducted a hearing *de novo* and affirmed the decision of the stewards. Plaintiffs sought administrative review in the trial court, which upheld the board's rulings as to three of the races, and set aside the rulings as to two of the races. The Board appeals the adverse ruling of the trial court regarding those two races.

The Board's Medication Rule C9.15 requires the Board's laboratory to test every winning horse's urine for foreign substances. Chris Time Pick won races on June 22, July 5, July 18, and July 28, 1983. Poco Perry won a race on June 28, 1983. Urine samples were obtained and tested after each race.

The June 22 urine sample was found to be negative, while the June 28 sample was found to have a suspect grey spot. All suspect spots were routinely checked on a machine called a mass spectrometer. The laboratory owned one mass spectrometer, and testing was scheduled in accordance with priorities discussed below. The laboratory chemist, Kerry Even, testified that the June 28 sample was not tested immediately because the spots were not strong, and because similar spots had never proved to be caused by a drug. The June 28 sample was scheduled along with other routine tests to be performed on the mass spectrometer.

The July 5 urine sample was found to be negative. The July 18 urine sample was found to be suspect because of grey spots, although the spots were not overly vivid. The July 18 sample was scheduled for further routine testing on the mass spectrometer.

Ten days later, the sample taken after the final race on July 28 clearly revealed the presence of naproxen on the first screening. Naproxen is a nonsteroidal anti-inflammatory agent which reduces swelling. Research has begun in Illinois to establish acceptable blood levels of the drug in racing horses. Thus far, however, no levels have been

established or approved and any amount of naproxen in a racing horse remains prohibited under the Medication Rules. The spot in the July 28 sample was large and met naproxen standards. The sample, therefore, was scheduled immediately for testing on the mass spectrometer. Because the laboratory personnel remembered that the July 18 sample had also shown a suspect spot which could be naproxen, it was also immediately tested on the mass spectrometer. The tests confirmed that both the July 18 and 28 samples contained naproxen. The laboratory did not attempt to determine the amount of naproxen in the samples because any amount was prohibited.

The laboratory informed the Board stewards of the positive results and an inquiry was convened. The stewards directed the laboratory to back-test the June 22, June 28 and July 5 samples. The mass spectrometer showed that each sample contained naproxen.

The inquiry revealed that Janisch had been giving naproxen to Chris Time Pick for osteoarthritis. A veterinarian had recommended to Janisch that she discontinue using the drug 72 hours prior to racing. It was stipulated that if a horse had liver and kidney problems, like Chris Time Pick's, the naproxen might linger in the horse's system for longer than usual.

With regard to the four Chris Time Pick races, the stewards fined Janisch a total of $800 and suspended her license for two days for violating its Medication Rules C9.4 and C9.6, which prohibit a horse's carrying of, or a person's administration of, "any foreign substance." Rule C9.4 further specifies that this prohibition exists "irrespective of when administered or injected." The stewards found that while Janisch had not given naproxen to Poco Perry, she had failed to guard the horse in violation of Rule C9.20, which requires every trainer to guard racing horses to prevent drugging. For this violation, Janisch was fined $200 and was suspended for 10 days. Plaintiffs appealed these rulings to the Board, and a hearing *de novo* was conducted.

At the Board hearing, plaintiffs argued that the amounts of naproxen found in the horses were too small to require penalties, and that the Board violated its own policy by delaying the naproxen testing in favor of doing research on the mass spectrometer.

With regard to the amounts of naproxen found, plaintiffs submitted a report by Dr. Thomas Tobin, a veterinarian employed by the University of Kentucky. According to the report, Dr. Tobin's analysis of the samples showed the levels of naproxen were consistent with an administration four days earlier, but that blood level analysis would be more accurate for quantification purposes. John D. McDonald, director of the Board laboratory, testified that blood level analysis would

be more accurate and that he questioned the accuracy of Dr. Tobin's quantification methods.

In its decision, the Board rejected plaintiff's argument that the level was too small to constitute a violation. It held that Medication Rule C9.4 makes no exception for trace levels or small amounts of naproxen, "if indeed the amounts in the horses involved in these cases were small." The Board also noted that plaintiffs could have used the prerace testing services offered by the Board, but that plaintiffs never requested these services even though they knew Chris Time Pick was receiving naproxen.

The Board further noted that Dr. Tobin's report, which attempted to quantify the amount of naproxen in the five samples, could not be relied upon because no proper foundation had been laid. While Dr. Tobin indicated that blood levels were required for an accurate determination of the forensic significance of trace levels, plaintiffs never furnished Dr. Tobin with the blood samples, although they were available. Thus, the Board held that it would not give any weight to the low levels of the naproxen even if Dr. Tobin's methods for measuring naproxen in urine were established as being reliable.

The Board also addressed plaintiffs' argument that the laboratory had violated Board policy in using the mass spectrometer for research before performing tests on the suspect spots. In 1981, the Board established its policy for laboratory priorities. First, current samples would be tested; second, research would be conducted; and third, back testing would be completed. During the summer of 1983, when plaintiffs' horses were racing, many racing horses were being given the prohibited foreign substance ethacrynic acid, a potent diuretic. It remains detectable in the horse for only eight hours, and thus any positive post-race sample establishes race-day administration of the prohibited drug. Kerry Even testified that "the priorities had been changed and routine screening by GC mass spec was altered." He was told to let routine screening for naproxen and other acid-extracted drugs wait while he tried to increase the mass spectrometer's sensitivity and develop a test to screen for ethacrynic acid.

McDonald testified that routine tests for drugs such as naproxen were held until ethacrynic acid testing on the mass spectrometer was completed. The routine naproxen tests reduced the sensitivity of the mass spectrometer, requiring recalibration before ethacrynic acid testing could be resumed. McDonald also testified that the ethacrynic acid testing was done with regard to current samples and was not research.

Plaintiffs maintained before the Board that ethacrynic acid testing

was research. They argued that by delaying testing of the suspect spots in the June 28 and July 18 samples, plaintiffs suffered harm because they continued racing Chris Time Pick under the assumption that the naproxen was out of his system by race time.

The Board found no violation of its policy. The one instrument was needed for current testing of both ethcrynic acid and naproxen. The Board dismissed Even's remark as to a change in priorities as a matter of semantics. The remark did not connote that research was performed. The Board noted the seriousness of drugging horses with ethacrynic acid, and found that the laboratory had to allocate resources consistent with the Board's priorities, and that the laboratory made a rational decision under the circumstances. The Board noted that when the first screening of the July 28 sample showed naproxen, the sample was immediately tested on the mass spectrometer.

Thereafter, plaintiffs filed the present complaint. The trial court affirmed the Board's decision concerning the races of June 28, July 18, and July 28, but reversed the decision with respect to the June 22 and July 5 races. The court held that the amounts of naproxen in Chris Time Pick after those two races "were so miniscule as to be de minimus" because even after the initial screening tests, "they still didn't find the drugs."

On appeal, plaintiffs have abandoned their argument regarding the amounts of naproxen being so small as not to constitute violations. Nevertheless, we address the issue because it was the basis of the trial court's reversal of two Board rulings.

■ The Racing Board Rule C9.4 and Rule C9.6 prohibit the use of any foreign substance unless specifically authorized, and we have previously upheld this rule as a valid exercise of the Board's authority. (*Kline v. Illinois Racing Board* (1984), 127 Ill. App. 3d 702, 469 N.E.2d 667.) Until acceptable levels are established, the mere presence of a foreign substance, regardless of the amount, violates Board rules. We agree with the Board that the applicable rules do not make exceptions for miniscule or trace amounts of naproxen. (See *Margulis v. Illinois Racing Board* (1985), 132 Ill. App. 3d 38, 476 N.E.2d 1116.) We therefore decline to find the amount of naproxen to be relevant, because such a finding would require us to alter the plain meaning of the word "any" and thereby read into the rule an exception for trace amounts of illegal drugs.

In defending this appeal, plaintiffs rely solely on the argument that the Board violated its own policy by performing research before current testing was completed. Plaintiffs make this contention only with regard to the June 22 and July 5 races, and have not filed a

cross-appeal with regard to the decisions in the other three races.

▮ An administrative agency must comply with its own rules and policies. (*Inwang v. Community College District No. 508* (1983), 117 Ill. App. 3d 608, 453 N.E.2d 896.) Thus, the Board's laboratory must comply with the Board policy regarding the completion of current testing before research begins. The Board, however, found that the ethacrynic acid testing was not research. Reviewing courts accord substantial deference to administrative agencies in the interpretation and application of their rules and policies, and the agency's interpretation enjoys a presumption of validity and will not be set aside unless it is plainly erroneous. *Rend Lake College Federation of Teachers v. Board of Community College* (1980), 84 Ill. App. 3d 308, 405 N.E.2d 364; *Taylor v. Police Board* (1978), 62 Ill. App. 3d 486, 378 N.E.2d 1160.

▮ The use of the mass spectrometer in the ethacrynic acid project did involve the development of a more refined test for detecting the drug. That test, however, was used for analyzing approximately 50 current samples, 11 of which established proof of the administration of a potent illegal drug on racing day. Thus, the ethacrynic acid testing is distinguishable from a project involving substantial academic research and little or no current testing. Accordingly, we find no plain error in the Board's decision that the project was current testing, and not research. We must then ask whether the Board's policy interpretation, which allows its laboratory director to postpone current naproxen testing in favor of other current testing, is plainly erroneous.

▮ The horse racing industry depends upon public confidence, which demands integrity and professional efficiency in the industry's operation. (*Phillips v. Graham* (1981), 86 Ill. 2d 274, 427 N.E.2d 550.) This dependence reveals itself in the Illinois Horse Racing Act of 1975. The Act gives the Board the power to promulgate reasonable rules for administering the Act in order to prevent practices detrimental either to the public interest or to the integrity of the horse racing industry. (Ill. Rev. Stat. 1983, ch. 8, par. 37—9(b).) This power includes the authority to maintain a testing laboratory (Ill. Rev. Stat. 1983, ch. 8, par. 37—9(f)), and to prohibit the use of certain drugs in racing horses (Ill. Rev. Stat. 1983, ch. 8, par. 37—36(a)). Where statutory authority is granted to an administrative agency, there is a corresponding grant of power to do whatever is reasonably necessary to exercise that authority. *Ray v. Illinois Racing Board* (1983), 113 Ill. App. 3d 510, 447 N.E.2d 886.

▮ The decision to schedule more time for ethacrynic acid tests

was reasonable. It would have been impractical, unreasonable and professionally inefficient to attempt to test for ethacrynic acid on the mass spectrometer, readjust the machine for a naproxen test, then readjust and clean the machine again for more ethacrynic acid tests. The seriousness of using ethacrynic acid in comparison to using naproxen, and the frequency of positive ethacrynic acid results also contribute to the reasonableness of the decision of the laboratory director. Moreover, the immediate interruption of ethacrynic acid testing when first level screening showed the presence of naproxen in Poco Perry's June 28 sample also indicates that the laboratory director's decision was reasonable and did not endanger the policy concerns underlying the Illinois Horse Racing Act.

Plaintiffs' reliance on *Heavner v. Illinois Racing Board* (1982), 103 Ill. App. 3d 1020, 432 N.E.2d 290, to support their argument that the Board loses its enforcement authority when it violates its own rules, is misplaced. In that case, the rule required a certain official to be present to open the entry box but that official had not been present. No similarly clear violation exists here. Therefore, we do not find the board's ruling plainly erroneous.

For the foregoing reasons, the judgment of the circuit court setting aside the Illinois Racing Board's decisions as to the June 22 and July 5 races is reversed.

Judgment reversed.

WHITE, P.J., and RIZZI, J., concur.