CARA TATE, Petitioner-Appellant, v. POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Respondents-Appellees.

First District (1st Division)   No. 1—91—3086

Opinion filed January 4, 1993.

Law Offices of Joseph V. Roddy, of Chicago (Joseph V. Roddy and Thomas J. Pleines, of counsel), for appellant.

Kelly R. Welsh, Corporation Counsel, of Chicago (Bobbie McGee Gregg, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

On March 26, 1990, the superintendent of Chicago police filed charges with respondent, Police Board of Chicago (the Board), alleging that petitioner, Cara Tate, violated several Chicago police depart-

ment rules.[1] The charges stemmed from events occurring on the night of September 18, 1988, both in and outside of the 29th Street police station in Chicago. Tate entered a plea of not guilty, and the Board conducted an administrative hearing. On January 15, 1991, the Board issued its "Findings and Decision" in which it found Tate guilty of the charges and discharged her from her employment. Tate sought administrative review in the circuit court. That court denied Tate's petition and affirmed the Board's findings and decision. Tate appeals.

We affirm in part and reverse in part.

At the administrative hearing, Vincent McLaurin testified that, on the night of September 18, 1988, he was driving on Prairie Avenue in Chicago, when he noticed that the car behind him "veered out" as if to pass him. The car did not pass, but remained behind McLaurin's car. After a second attempt to pass was made, McLaurin speeded up and, at the corner of 29th Street, turned left. The car behind him then "cut [him] off" directly in front of the 29th Street police station. The driver of the car, identified as Tate, pointed at McLaurin and, as she exited her car, asked him to get out of his car. McLaurin refused, and Tate demanded to see his identification. McLaurin refused and asked Tate to show her identification. Tate again asked McLaurin for identification, then grabbed McLaurin by the neck. According to McLaurin, Tate, who was in plain clothes and drove her own car, never identified herself as a police officer. McLaurin grabbed Tate's wrists and told her that if there was a problem, they could go to the nearby police station. Tate responded by demanding that he show his identification and exit the car. She grabbed McLaurin by the hair and pulled his head toward the outside of the car. During the altercation, Tate broke two gold necklaces which McLaurin was wearing.

As Tate and McLaurin continued to struggle, another car pulled up in front of Tate's car. A uniformed woman and a man in plain clothes exited. The female officer told McLaurin to get out of the car, which he did, and the man handcuffed him. During Tate's ensuing search of his car, McLaurin saw Tate "throw[ ] stuff around." For ex-

---

[1]Tate was accused of violating Rule 1 ("violation of any law or ordinance"), Rule 2 ("any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department"), Rule 6 ("disobedience of an order or directive, whether written or oral"), Rule 7 ("insubordination or disrespect toward a supervisory member on or off duty"), Rule 8 ("disrespect to or maltreatment of any person, while on or off duty"), Rule 9 ("engaging in any unjustified verbal or physical altercation with any person, while on or off duty"), Rule 14 ("making a false report"), and Rule 15 ("intoxication on or off duty").

ample, she pulled McLaurin's radio equalizer from the dashboard and dumped the purse of McLaurin's female passenger. When Tate exited from his car, McLaurin detected a "strong" odor of alcohol. McLaurin indicated to the uniformed officer that he wished to press charges and later, at the station, saw Tate, pacing and talking loudly.

The testimony of Dawan Johnson, McLaurin's passenger, was similar to McLaurin's in all material respects. Johnson characterized Tate's behavior that night as "rude and loud."

Chicago police officer Donna Barnes testified that, as she was leaving the 29th Street police station, she saw Tate struggling with an individual who was seated in a car. At the time, Barnes had just gotten off duty and was being driven home by her fiance, Brandon English. Barnes noticed that Tate's car was parked "diagonally" in front of the other car, and Tate was standing at that car, struggling with the driver and shouting for help. English backed his car up, and Barnes, with gun drawn, exited, announced her office, and ordered the driver out of the car. Sergeant Minogue then drove up to the scene and asked Barnes what was going on. Barnes explained that she responded to Tate's shout for assistance, but did not know the nature of the altercation. Barnes then left the scene, but was later recalled to the station to fill out a report of the incident.

According to Sergeant James Minogue, McLaurin was in handcuffs, and Tate was searching McLaurin's car when he arrived on the scene. The car's stereo component was on the floor, and papers were strewn on the car's floor. Barnes told Minogue that she saw Tate and McLaurin struggling as she was leaving the station. Another squad car then arrived at the scene, and Minogue ordered one of its officers to take charge of McLaurin. Tate told Minogue that she had noticed McLaurin driving suspiciously on Prairie Avenue and attempted to pull him over when he turned onto 29th Street. McLaurin refused and said to her "you must be one of them." In response, Tate pulled her car in front of his. When McLaurin refused to exit his car, Tate saw Barnes and summoned her for assistance. Minogue stated that Tate was "agitated" and that he could "smell a little bit of alcohol on her breath." Tate ignored him when he asked her if she had been drinking. Because McLaurin complained about his treatment, Minogue decided that everyone involved should return to the station. Minogue told Tate to go to the station, but ordered her not to drive. Tate replied that she was going to drive and entered her car. Minogue walked up to the car window and ordered her out of the car, but Tate put the car in gear and drove around him.

At the station, Minogue informed the watch commander, Lieutenant Margaret Nugent, of the incident. Tate, who was also present, was very loud and abusive toward both Minogue and Nugent. Tate would not listen to Minogue when he tried to speak with her. Her behavior was erratic, as she alternatively laughed and yelled. Minogue eventually was instructed to charge Tate with driving under the influence. He read Tate her *Miranda* rights. Tate refused to take a breathalyzer test when asked by both Minogue and Nugent.

Chicago police officer Percy Roland was also on the scene outside the station house on 29th Street, and Minogue told him to take McLaurin into custody. Roland later filled out a battery report and issued two traffic citations. At the station, Roland saw Tate "yelling" in the watch commander's office.

Lieutenant Nugent interviewed both Minogue and Tate to determine if Tate had broken any department rule. Nugent noted that Tate's eyes were "red and glossy," and she had a "slight odor of alcohol on her breath." As Minogue began to tell Nugent about the incident, Tate interrupted him and demanded to speak to someone from the Fraternal Order of Police. Tate continued to yell out and was "disruptive" and "boisterous." Tate then asked to speak to Nugent alone. She explained that she had seen McLaurin driving suspiciously and had pulled him over. When Nugent asked Tate what legal justification she had had to make the stop, Tate "jumped out from her chair" and started yelling at Nugent. When Tate physically demonstrated the manner in which she pulled McLaurin from his car, Nugent asked her if she had been drinking. Tate replied that she had had a few drinks. Nugent characterized Tate's behavior as erratic.

Nugent next spoke with Minogue. Both determined that Tate was under the influence of alcohol, and they consulted the "General Order" in order to ascertain how to handle the situation. Nugent obtained a "CR information" and notified the first deputy superintendent of the situation. At 1:30 a.m., Nugent instructed Minogue to start filling out the necessary forms. Nugent then returned to the office where she advised Tate that, based upon her actions and demeanor, and Minogue's observations, Tate would be charged with "DUI." Tate repeatedly stated that she had done nothing wrong and interrupted Minogue as he attempted to read her *Miranda* rights to her. After Tate was informed of her administrative rights, Nugent ordered her to submit to a breathalyzer test, but Tate refused. Tate was allowed to telephone the Fraternal Order of Police.

Sergeant Wayne Hovland of the Chicago police department's internal affairs division was summoned in connection with Tate's case.

Hovland arrived at the 29th Street station between 3:30 and 4 a.m. After speaking with Nugent, Hovland determined that there was "sufficient cause" to require Tate to submit to a urinanalysis. He introduced himself to Tate and advised her that, based on her actions, he was requiring a urine specimen from her. He told her that she would be asked to submit to the test first, and, if she refused, would then be given a direct order to submit. Tate refused to cooperate, and Hovland then prepared a new notification of charges stemming from this refusal. According to Hovland, the "criminal aspect of the investigation" had been terminated when he asked Tate to submit to the urinanalysis. Hovland attempted to explain to Tate that the administrative proceedings were commencing, but Tate continually interrupted him.

Assistant Deputy Superintendent Ivan Rittenberg was called to the 29th Street station, where he introduced himself to Tate. After being apprised of the situation by both Minogue and Nugent, he informed them the appropriate action to take consisted of issuing Tate a citation for "DUI" and of allowing McLaurin to lodge a complaint. He then instructed Minogue and Nugent to begin the administrative investigation. To that end, Tate was advised of her administrative rights and was told that she was no longer in custody. Rittenberg stated that he made clear to Tate that the administrative procedure was not "to garner evidence against her in a criminal prosecution." Tate was ordered to give a urine sample and to submit to the breathalyzer test. Rittenberg informed her that she could not be forced to do either, but that under administrative law, she was required to comply. Rittenberg described Tate as "angry" and "irritated." Rittenberg was present when Tate refused to comply with the orders given to her.

Chicago police evidence technician Thomas Kelly was called to the 29th Street station to administer a breathalyzer test to Tate. Kelly witnessed Tate refuse Nugent's order to submit to the test.

In her own behalf, Tate testified that she was off duty on September 18, 1988, but went to the 29th Street station to pick up her paycheck. As she was looking for a parking space, she noticed a car behind her. The car pulled up alongside her vehicle, and the driver, McLaurin, shouted, "There is one of those motherfuckers there." Tate characterized the driver's actions as "suspicious." McLaurin "veered" sharply in front of Tate's car and "almost" hit it. Tate drove after him, pulled alongside his car, and showed her identification badge. She then asked him to pull over. After identifying herself as a police officer, she ordered McLaurin from his car. McLaurin reached out to Tate through his open car window. He grabbed her fingers and wrist

and "bent them back." As she was struggling with McLaurin, Tate saw Officer Barnes and Barnes' fiance leave the station, and she yelled to them for assistance. With the aid of Barnes and English, McLaurin was removed from the car and handcuffed. Tate denied ever grabbing McLaurin by the shirt, neck, or hair. When Sergeant Minogue came to the scene, McLaurin began screaming and yelling so Minogue told everyone to go to the station to "straighten things out." Minogue then walked toward the station, and Tate went to her car, which was still in the street, and drove it to a nearby parking area. Tate stated that she never heard Minogue tell her not to drive. At the station, Tate was told to go to the watch commander's office.

Minogue joined her in the office, and she told him what had occurred. He then left the office and returned with papers. Minogue told her that McLaurin said she had been drinking and that they would have to charge her with "DUI." Minogue read Tate her *Miranda* rights. Tate became very upset at this time. She refused to submit to the breathalyzer test because she believed that, under *Miranda*, she did not have to say or do anything. Tate maintained that she had not been drinking and that she was not under the influence of any substance. Tate was "very confused" because she had never been in such a situation in her life. Between 4:30 and 5 a.m., Roland gave her two tickets and the implied motorist consent form. Hovland then arrived and read her administrative rights. Tate told Hovland that she was not answering any questions under her *Miranda* rights. Tate stated that she believed that her criminal rights "overrode" the administrative rights. Hovland told her that the criminal investigation was over and asked for a urine sample. When she refused, Hovland ordered her to provide the sample. Tate refused, stating that she was "being railroaded" for something she did not do. At 5 a.m., she was allowed to leave the station.

The two tickets Tate received that night were eventually "thrown out" of court, and Tate was never convicted of any offense arising from the night's events. Tate returned to duty two weeks later, reporting to the field inquiry unit. Tate has never been disciplined for any other conduct apart from the incident at question, and she has received efficiency ratings in the high 80s and low 90s. During her tenure as a police officer, Tate received six honorable mentions. Tate admitted that she was "confused" on the night in question because she had "never been locked up and they kept threatening [her] with that." Tate maintained that she did not intend to be insubordinate.

Several witnesses testified to Tate's good character, excellent work record, truthfulness, respectfulness, and sobriety. However, one

witness, Chicago police officer Rosella Clayborn, admitted that on the day after the incident, Tate had telephoned her and had told Clayborn that she had been drinking vodka before she had the altercation at the station. Tate also admitted to Clayborn that she had sworn at some officers.

■ Tate's first argument concerns the Board's finding that Tate violated Rule 14, which prohibits an officer from "making a false report, written or oral." The Board found that Tate violated Rule 14 by providing "false responses during her formal statement at the Internal Affairs Division." In response, the Board concedes that this finding is against the manifest weight of the evidence and that this court "must overturn the Board's decision with respect to this finding." Accordingly, we vacate the Board's finding of guilt as to Rule 14.

■ Tate next challenges the Board's finding that she violated Rule 6, arguing that the finding is contrary to law.

Specifically, the Board found that Tate violated Rule 6 ("disobedience of an order or directive, whether written or oral") by refusing to comply with Sergeant Minogue's order not to drive her car, Lieutenant Nugent's order to submit to the breathalyzer test, Sergeant Hovland's order to provide a urine specimen, and by failing to do either, contrary to the Department's written directives.

Tate contends that these findings of guilt are contrary to law in that her *Miranda* rights protected her from having to respond to questioning and submit to the tests.

We have reviewed carefully the record and are satisfied that Tate received the full constitutional protection afforded to her by the *Miranda* rights. The testimony adduced at the hearing clearly establishes that the criminal aspect of the investigation had ended and the administrative process had commenced when Tate refused to obey the orders of her superiors.

Parenthetically, we note that the *Miranda* rights do not shield citizens from requests for chemical breath analyses. The United States Supreme Court has held that the privilege against self-incrimination does not extend to circumstances such as requests for a sample of blood from a defendant in order to perform a blood test. (*Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826.) The Court noted that *Miranda* applied only to "testimonial" evidence and not to "physical" evidence. (*Schmerber v. California*, 384 U.S. at 764-65, 16 L. Ed. 2d at 916-17, 86 S. Ct. at 1832-33.) Our own supreme court, in addressing the same argument with regard to breathalyzer tests, adopted the *Schmerber* holding in *People v. Mulack* (1968), 40 Ill. 2d 429, 240 N.E.2d 633.

Tate also complains that the Board did not follow its own regulations in the pursuit of its investigation, arguing that the State's Attorney's office was never contacted during the course of events on September 18, 1988. We find this argument unpersuasive.

The department's "Conduct of Investigation" states:

> "If the alleged act is a crime and the evidence is such that had the crime been committed by a private citizen it would have resulted in his arrest, the investigator will explain the circumstances to his commanding officer of exempt rank who will contact the Assistant Deputy Superintendent, Internal Affairs Division, the Administrators of the Office of Professional Standards, or the on duty assistant deputy superintendent, Bureau of Operational Services. The Assistant Deputy Superintendent, Internal Affairs Division Administrators of the Office of Professional Standards, or the assistant deputy superintendent, as appropriate, will determine the further action to be taken, consulting the office of the State's Attorney and appropriate Detective Division personnel for guidance *when necessary.*" (Emphasis added.)

As the above-cited language indicates, notification of the State's Attorney is not mandatory. The evidence adduced at the hearing indicates that the directive was followed and that the appropriate personnel were contacted.

An administrative agency's findings of fact upon review "shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) Upon review of the findings of an administrative agency such as the Board here, this court must determine whether the findings are against the manifest weight of the evidence. (*Launius v. Board of Fire & Police Commissioners* (1992), 151 Ill. 2d 419.) This court is precluded from weighing the evidence and then determining where the preponderance of the evidence lies. (*Mead v. Board of Review* (1986), 143 Ill. App. 3d 1088, 1094, 494 N.E.2d 171.) Therefore, the focus, upon review, is on whether the agency's final decision is just and reasonable in view of the evidence in the record. *Mead,* 143 Ill. App. 3d at 1095.

Here, Minogue testified that he ordered Tate not to drive her car, but that she disobeyed this order. Nugent averred that she ordered Tate to submit to the breathalyzer test, and Tate refused. Sergeant Hovland swore that Tate refused to obey his two orders to provide a urine sample. Finally, Rittenberg testified that he was present when Tate refused to take the breathalyzer test and to provide a urine sample. We are particularly mindful of the fact that Tate was informed, at

the conclusion of the criminal investigation, that the administrative process against her was beginning. Although Tate may very well have been "confused" and "frightened" during the events of the night, the record reveals that those around her attempted to alleviate some of these anxieties. For example, Tate's superior officers tried to differentiate between the *Miranda* warnings and the administrative rights for Tate, but Tate was disrespectful, disruptive, and discourteous during these attempts. The Board's determination regarding Tate's violation of Rule 6 was not against the manifest weight of the evidence.

Tate also contends that the sanction of discharge is too severe a penalty for the type of infractions at issue.

A public employee in Illinois can only be discharged for "cause." "Cause" has been held to mean "some substantial shortcoming which renders continuance in his office or employment in some way detrimental." (*Mihalopoulos v. Board of Fire & Police Commissioners* (1978), 60 Ill. App. 3d 590, 596, 376 N.E.2d 1105. See also *Massingale v. Police Board* (1986), 140 Ill. App. 3d 378, 380, 488 N.E.2d 1289; *Albert v. Board of Fire & Police Comm'n* (1981), 99 Ill. App. 3d 688, 425 N.E.2d 1158.) Unlike the Board's findings of fact, determinations of "cause" are subject to judicial review to determine if the charges brought are unreasonable or arbitrary, and the dismissal is unrelated to the requirements of service. (*Mihalopoulos*, 60 Ill. App. 3d at 596.) Moreover, "cause" for discharge can be found regardless of whether other employees have been disciplined differently. *Launius v. Board of Fire & Police Commissioners*, 151 Ill. 2d 419.

■ We are of the opinion that Tate's conduct, when viewed in its entirety, warrants the sanction of dismissal. Although Tate's continued refusals to obey the orders of her superiors were egregious acts of insubordination, even more troubling was her physical altercation with McLaurin, a private citizen who the record indicates had done nothing to warrant such police action. This alone is conduct which is detrimental to both the discipline of and the efficiency of the department. See *Taylor v. Police Board* (1978), 62 Ill. App. 3d 486, 378 N.E.2d 1160.

Although we have reversed the Board's findings as to Tate's alleged violation of Rule 14, remandment of the entire cause to the Board is unnecessary in light of our affirmance of what we consider to be the more serious charges against Tate. See *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 307 N.E.2d 371 (remand proper where only the less serious finding of the Board is sustained on appeal); see also *Douglas v. Daniels* (1978), 64 Ill. App. 3d 1022, 382 N.E.2d 90

(cause not remanded where more serious charges were affirmed and a lesser charge was reversed on review).

The order of the circuit court, therefore, is reversed in part and affirmed as modified to reflect the vacatur of the Board's finding of guilt as to Rule 14.

Reversed in part and affirmed as modified.

MANNING, P.J., and BUCKLEY, J., concur.