MELVIN BLUNIER et al., Plaintiffs-Appellees and Cross-Appellants, v. THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF PEORIA et al., Defendants-Appellants and Cross-Appellees.

Third District    Nos. 3—88—0803, 3—88—0834 cons.

Opinion filed October 11, 1989.—Rehearing denied November 28, 1989.

David L. Thomas, Corporation Counsel, and Roy G. Davis, of Keck, Mahin & Cate, both of Peoria (Louise Natonek and Robert M. Riffle, of counsel), for appellants.

Joe R. Vespa, of Sonnemaker, Sonnemaker & Vespa, P.C., of Peoria (William Morris, of counsel), for appellees.

JUSTICE SCOTT delivered the opinion of the court:

This is an appeal from the final judgment of the circuit court of Peoria County pursuant to Supreme Court Rule 301 (107 Ill. 2d R. 301.) Defendants-appellants appeal from the circuit court orders of July 1, 1988, September 6, 1988, October 17, 1988, November 7, 1988, November 9, 1988, November 10, 1988, and December 7, 1988, wherein the court essentially reversed the decision of the Board of Fire and Police Commissioners of the City of Peoria (the Board) on three of four charges finding plaintiffs-appellees had violated certain sections of the Manual of Rules of the Peoria Fire Department (the Manual) and also reversed the Board's order discharging plaintiffs based on their violation of charge 4. Plaintiffs and cross-appellants appeal from the circuit court's order of July 1, 1988, affirming the Board's finding against plaintiffs on a fourth charge.

Plaintiffs, Melvin Blunier (Blunier) and Robert Ochs (Ochs), are each firemen with the City of Peoria and were assigned to duty at the Heart of Illinois Fair, Peoria, Illinois, during the early morning hours of July 13, 1986. Each plaintiff was charged with four violations of the Manual arising from an incident that allegedly took place at the Heart of Illinois Fair on July 13, 1986. The charges for each plaintiff were essentially the same and stated:

"1. That on the 13th day of July, 1986, the said [plaintiff] did while in uniform and assigned to fire fighting duties at Exposition Gardens, 1601 W. Northmor Road, Peoria County, Illinois, did commit an act of sexual penetration with Tammie Lacks which was against her will and without her consent, which is

conduct unbecoming an employee which might be detrimental to the service in violation of Section 2000.28(G) of the Manual of Rules of the Peoria Fire Department.

2. On July 13, 1986, the said [plaintiff] did while in uniform and while assigned to fire fighting duties at Exposition Gardens, 1601 W. Northmor Road, Peoria County, Illinois engage in conduct involving moral turpitude so as to be detrimental to your performance and effectiveness in the Department in that he did commit an act of sexual penetration with Tammie Lacks which was against her will and without her consent, in violation of Section 2000.28(J) of the manual of Rules of the Peoria Fire Department.

3. On July 13, 1986, the said [plaintiff] was neglectful of his assigned duty in that he did engage in sexual relations with Tammie Lacks while in uniform and assigned to fire fighting duties at Exposition Gardens, 1601 W. Northmor Road, Peoria County, Illinois in violation of Section 2000.28(D) of the Manual of Rules of the Peoria Fire Department.

4. That on the 13th day of December, 1986, the said [plaintiff] did disobey and fail to comply with Departmental Orders, in that he did repeatedly fail to answer the questions of Donald R. Sorensen of Sorensen Investigative Agency, Inc., concerning the incident which was the basis of the pending charges filed against [plaintiff] dated December 13, 1986, although ordered by his superior officer, Assistant Fire Chief Robert Frye, to so answer the questions, in violation of Section 2000.28(E) of the Manual of Rules of the Peoria Fire Department."

The first issue is whether the circuit court erred in reversing the Board's findings against both Ochs and Blunier as to charges 1, 2 and 3. A summary of the facts regarding the first three charges follows.

Tammie Lacks (Tammie), the complaining witness, testified at the Board hearing that she arrived at the Heart of Illinois Fair in mid-afternoon on July 12, 1986. She went to the fair with her husband, Bill, who then went to work at the fair for the Crystal Ice Company about 4 p.m. After Bill went to work, Tammie testified that she walked around with a friend until evening and then met some people who worked at the fair and spent the rest of the time getting cigarettes, sandwiches and coffee for the individuals running the carnival rides. Bill got off work at 10 to 10:30 p.m., at which time he and Tammie talked to an individual working for the carnival who invited them to stay after the fair closed for a party. Tammie and Bill stayed for the party, and while there, Tammie sat around and talked and re-

lated she did not have any alcoholic beverage. After a while Bill brought his car over by the party so they could listen to music. Tammie then walked to a brick rest room facility and came back to the party and sat in a truck with her purse beside her. When she later got up to change the tape in the car she noticed her purse was gone. She stated that her purse contained her Mysoline, which she takes to control seizures, and about $50. She then went back to the rest rooms to see if she had left the purse there but did not find it. While standing outside of the rest rooms, two men walked by and Tammie asked them if they had seen her purse. They responded they had not but that they were firemen and had a phone where they were working so she could report it. Tammie further stated she wanted to go get her husband, but the shorter fireman said he would get her husband for her. They then proceeded to a building where the tall fireman made a call. Tammie described the building as containing a table and some chairs, two phones and a pickup truck. The shorter fireman left to supposedly get her husband. Both firemen were described by Tammie as dressed in normal blue jeans, like her, with the tall fireman wearing glasses. It is generally undisputed throughout that the building being referred to by Tammie is known as the "labor building."·

Tammie related that after the shorter fireman left, the tall fireman was "real nice and he offered me a beer and I said no and he told me to go ahead and sit on the back of the gate of the truck and so I did." The shorter fireman came back and closed the front door and said her husband would be coming shortly. Tammie testified that the two firemen were talking in riddles and were drunk, with the tall fireman sitting beside her and the shorter fireman standing next to her. Tammie then stated she had to go to the rest room, and the tall fireman said he also had to use the rest room and went over to a beam holding up the rafters and told Tammie to come over with him. She said no, but the shorter fireman grabbed her arm and took her over to the pole "[k]ind of with force but not too forceful." The tall fireman then pulled his zipper down, exposed his penis and asked Tammie to hold it. She stated that each time he tried to pull her hand to his penis she pulled her hand away. After the tall fireman urinated, he attempted to force Tammie's head to his penis and she kept pulling away stating she had to go to the rest room. The shorter fireman was still holding her arm during this time. The tall fireman then told her there was a portable rest room outside the building and walked her to it. The shorter fireman stayed behind in the building to supposedly wait for Tammie's husband to arrive.

Tammie testified she went into and used the portable rest room

and while she was pulling up her pants the tall fireman opened the door and pushed her back onto the stool. He then started mumbling words and got onto his knees and fondled her vagina with his fingers. He then put his penis in her vagina and ejaculated. She testified he next forced her to perform fellatio until he again ejaculated. The tall fireman then "mumbled something about it felt good and then he just kind of laid over and passed out." Tammie stated she then wiped her mouth on the sleeve of her jacket, left the portable rest room and "ran the wrong way" and went back to the labor building, where the shorter fireman was waiting, because she thought he would help her. The shorter fireman then stated that they had better go get the tall fireman and asked Tammie to help bring him back, so they walked over to the portable rest room and helped the tall fireman back to the building because "she loves people." The shorter fireman and Tammie then sat and talked for awhile after they got back to the labor building. The shorter fireman then grabbed her by the arm and forcefully walked her over to a corner and pushed her down on something that felt like a lawn chair. He then forcefully took her pants down and inserted his fingers into her vagina. Tammie testified she was menstruating at this time. The shorter fireman then wiped his finger off and inserted his penis into her vagina. She kept pleading with him to quit and he eventually complied. Tammie then got up and asked if she could please leave, and he said she could if she promised to come back and see him later. She promised she would be back in order to leave.

Tammie testified she ran trying to find a security guard or her husband and finally found her husband, who took her to the front office. She there talked to security personnel and policemen prior to going to the hospital. Tammie identified the tall fireman as wearing glasses and going by the name Mick. It is undisputed that Melvin Blunier goes by the name Mick.

On cross-examination, Tammie was questioned whether she had talked about this incident with certain individuals at a boarding house where she lived for a time. Tammie also indicated on cross-examination that she arrived at the party about 11:30 p.m.; that she had no beer while at the party or through the course of the evening nor did she tell anyone she did; that she met the two firemen at about 2:15 a.m.; that she left the building where the alleged assault occurred at about 6 a.m.; that she did not tell Detective Wood about the oral sex with the tall fireman in the portable rest room; and that she knew where she was when she ran to the labor building after she left the portable rest room where the tall fireman had allegedly assaulted her.

Blunier's and Ochs' testimonies were substantially similar. Both

testified they had reported to work on July 12, 1986, a few minutes before midnight. They both testified to walking around the grounds, getting something to eat and then retiring in their respective vehicles they had earlier pulled into the building at about 2 a.m. Both further indicated, however, that a young woman had approached Ochs about a missing purse and that Ochs then yelled to Blunier about whether anyone had reported a missing purse. Ochs stated that he called Blunier by his nickname "Mick." Both firemen related they were wearing standard firemen uniforms of dark blue pants and short-sleeve gray shirts during the hours in question.

David M. Kiselka testified he was a security officer on duty at the fair during the early morning hours of July 13, 1986. Part of his duties included patrolling the fair grounds and checking buildings. Between 2 and 3 a.m. on July 13, 1986, a white male approached him and said his wife was missing. Thereafter, Mr. Kiselka checked the fairgrounds, including inside the labor building, where he found two apparent firemen asleep; one in the back of a pickup truck, the other on a cot. He further stated all other buildings were locked and he could not get inside. Mr. Kiselka testified on cross-examination that he checked the labor building approximately every 45 minutes to one hour in the early morning hours of July 13, 1986, and found nothing other than the firemen asleep. He also spoke with Tammie that morning after the alleged assault, when she indicated to him that part of the assault occurred in a grassy area next to the labor building. He did not notice, however, any grass stains or other signs that Tammie had been involved in a struggle.

Detective Dale Wood of the Peoria County sheriff's department testified that he first came into contact with Tammie around 9:30 to 10:30 a.m. on July 13, 1986, at the Peoria County jail facility. During his interview with Tammie, however, she did not tell Detective Wood that one of the firemen had urinated in the barn or that she had been forced to perform oral sex in the portable toilet and had wiped her mouth on the sleeve of her sweat shirt. She also stated to Detective Wood that while she was in the labor building with two men, the person named "Mick" exposed his penis and the other person grabbed her from behind, forced her to her knees and then "Mick" placed his penis into her mouth until he ejaculated. She further described the two firemen to Detective Wood as wearing baseball caps and blue jeans.

Deputy Timothy Kenny of the Peoria County sheriff's department testified he first contacted Tammie at around 6 a.m. on July 13, 1986. He believed Tammie had been drinking alcoholic beverages but was

not intoxicated. Tammie related to Deputy Kenny that the incident with one of the firemen did not take place in a portable rest room but in a stall in one of the other rest rooms. Further, that the firemen at that time did not have intercourse with her and she did not mention being forced to perform oral sex.

Penny Knight and Harry M. Coons, Jr., both resided in the same house as Tammie a few months after the alleged incident took place. Both testified that Tammie had told them she and Bill had gone out to the fair for him to sell drugs and her to work prostitution. She further stated to both she had sex with six firemen at the fair on the date in question. Harry Coons specifically testified that Tammie stated to him the two being charged were not guilty.

Physical evidence presented at trial included two pubic hairs, a fingerprint and an apparent bloodstain taken from a poster in the labor building; semen stains on the shirt sleeve of Tammie's sweat shirt; other hair samples collected from Tammie's person that had fallen onto a white examination paper upon which Tammie undressed; and semen samples taken from Tammie's underpants and rectum. The fingerprint was identified by defendant's expert as that of the right middle finger of Ochs and the two pubic hairs were determined to be consistent with the pubic hair standard taken from Tammie. The red smear was preliminarily believed to be blood by defendants' expert Patricia Orr; however, she could not make a definite determination because she was unable to lift any of the substance from the poster for testing. All of the hair specimens from the examination sheet were found to be inconsistent with the standards taken from Ochs and Blunier, with the exception of one hair which Orr could not either include or exclude as being consistent with the standard taken from Blunier. Likewise, none of the semen specimens were conclusively determined to be from either Ochs or Blunier.

The first three counts against each plaintiff were based on the premise that Ochs and Blunier had engaged in sexual acts with Tammie while on duty as firemen, with the first two counts alleging these acts occurred without her consent. The Board, using the civil preponderance-of-the-evidence standard, found against each plaintiff on all three counts. The primary evidence relied on by the Board against Ochs was the fingerprint, the red smear believed to be Tammie's menstrual blood, the two pubic hairs consistent with Tammie's standard, and her testimony, which the Board considered credible as opposed to that of Ochs. There was no physical evidence implicating Blunier, but the Board found Tammie's testimony credible as opposed to Blunier's testimony. The circuit court reversed the Board's decision

as to all three counts against each plaintiff without comment, finding the Board's decision arbitrary, capricious and contrary to the manifest weight of the evidence. Our standard for review is to determine whether the findings of the Board are against the manifest weight of the evidence. In other words, the decision of the administrative agency should be upheld unless an opposite conclusion is clearly evident from the record. (See *Collura v. Board of Police Commissioners* (1986), 113 Ill. 2d 361, 498 N.E. 2d 1148; *Davern v. Civil Service Comm'n* (1971), 47 Ill. 2d 469, 269 N.E. 2d 713; *Greene v. Board of Election Commissioners* (1983), 112 Ill. App. 3d 862, 445 N.E. 2d 1337.) The findings of fact made by the administrative agency are to be considered *"prima facie* true and correct." (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) "A decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in a light most favorable to the agency, the court determines that no rational trier of fact could have agreed with the agency's decision." *Service Employees International Local Union No. 316 v. Illinois Educational Labor Relations Board* (1987), 153 Ill. App. 3d 744, 753, 505 N.E. 2d 418.

■■ ■ Having full knowledge of the relevant standard to be applied, we hold that the circuit court correctly reversed the Board's findings as to the first three counts against both Ochs and Blunier. The manifest weight of the evidence indicates that after Ochs and Blunier arrived for work and then walked around and got something to eat, both retired for the evening in the labor barn. This is supported by the testimony of security officer Kiselka, who stated that he checked the labor building approximately every hour after from 2 a.m. to 6 a.m. on July 13, 1986, and found no sexual assault in progress, which is completely contradictory with Tammie's version that the alleged assault took place over a course of three hours in the labor building. Moreover, there has been no physical evidence which more probably than not shows that an alleged assault took place. None of the hairs or semen stains examined could be identified as being consistent with the hair or blood samples of either Ochs or Blunier. It is undisputed that two hairs consistent with Tammie as well as a fingerprint of Ochs and red smears in what is purported to be Tammie's menstrual blood were discovered in the labor building. This evidence, however, in light of all the other evidence or the lack thereof is insufficient. Defendants' expert only stated that the pubic hairs were consistent with Tammie and "could have come from Tammie Lacks." Regarding the apparent bloodstains on the poster, there was no final determination that it was blood, let alone Tammie's menstrual blood. The fingerprint evidence is the only solid physical evidence that defin-

itely incriminates one of the firemen, and this fingerprint evidence would certainly be more persuasive in a situation where it was found in a place that Ochs should not have been, but the labor building where it was found was a place where Ochs was supposed to be. While there appears to be a scintilla of physical evidence supporting the Board's finding, we do not believe it sufficient to support the Board's finding even when viewed in a light most favorable to the Board's decision. The manifest weight of the evidence standard does not require a reviewing court to search the record solely for the limited purpose of finding anything to support the agency's decision. A review of the entire record is required in order to determine whether the manifest weight of the evidence, as a whole, warrants a different conclusion than that of the agency.

Our decision is further supported by our determination that Tammie's credibility was materially impaired. Without getting into specific detail, since we have done so elsewhere, it appears as though Tammie told different versions of the alleged assault numerous times to various security and police officers, told others at her boarding house that something entirely different took place and even confessed to Mr. Coons that the two firemen charged were not guilty. This does not appear to be a situation where there is a mere variance in testimony, and as such, the Board's crediting of Tammie's testimony was also against the manifest weight of the evidence. See *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 307 N.E. 2d 371 (court determined police officer's credibility was materially impaired).

The next issue, pursuant to plaintiffs' cross-appeal, is whether the circuit court erred in affirming the Board's finding against Ochs and Blunier regarding charge 4. Briefly, charge 4 against Ochs and Blunier alleged that both disobeyed and failed to comply with departmental orders by failing to answer questions posed by an investigator after being ordered to do so by their superior officer in violation of section 200.28(E) of the Manual. Plaintiffs first allege their conduct was not of a type designed to be covered by section 200.28(E), because an order of a superior officer is not a departmental order as defined elsewhere in the Manual. We do not agree. Section 200.28(E) of the Manual provides:

> "Any member is subject to discipline by the Board of Fire and Police Commissioners or to dismissal, or suspension by the Board of Fire and Police Commissioners, for committing any of the following offenses:
>
> * * *
>
> E. Disobedience *or* failure to comply with Departmental Or-

ders, as defined herein." (Emphasis added.)

■ Clearly plaintiffs' refusal to answer questions after being ordered to do so is disobedience regardless of whether plaintiffs violated a departmental order.

Plaintiffs next assert the interrogation of them by the investigator employed by defendants violated their constitutional right of being free from self-incrimination. Particularly, plaintiffs charge they were not fully apprised, prior to the interrogation, that their answers would be inadmissible in criminal proceedings under the use immunity theory on the basis that the answers were being coerced under threat of discharge.

The interrogation was conducted by Donald Sorensen (Sorensen), an investigator hired by defendants for the purpose of investigating the events that allegedly transpired on July 13, 1986. The interrogation of both Ochs and Blunier occurred on December 18, 1986, with each fireman being interrogated separately. Prior to any questioning, Sorensen advised each fireman of his rights under the Firemen's Disciplinary Act (Ill. Rev. Stat. 1987, ch. 85, par. 2501 *et seq.*), and Acting Fire Marshall Robert Frye ordered each to answer every question truthfully, correctly, accurately and unevasively. Sorensen then proceeded to ask each fireman questions not particularly related to the alleged events of July 13, 1986, *i.e.*, name, age, marital status, etc. Upon Sorensen's first question having to do with the time period of midnight to 8 a.m. on July 13, 1986, the firemen's counsel, Mr. Sonnemaker, interjected and advised that the firemen were invoking their constitutional rights under the fifth amendment and would answer no questions regarding that particular time frame. Mr. Frye then again ordered each fireman to answer the question or be subject to disciplinary action. Defendants' counsel, Mr. Eric Margolis, stated, "for the record," that each fireman had refused to answer despite a direct order to do so and under threat of disciplinary action "which would be an exception to [the] right to claim the Fifth Amendment as the statement from here on out would be inadmissible in court." At which point, Mr. Sonnemaker indicated that each understood his constitutional rights and would continue to invoke his fifth amendment privilege. Sorensen then asked other questions unrelated to the hours of midnight to 8 a.m. of July 13, 1986, which were answered. Sorensen then again asked each fireman a number of questions regarding his respective activities from midnight to 8 a.m. on July 13, 1986, and again Mr. Sonnemaker interposed and asserted each fireman's constitutional rights.

■ Under the doctrine of use immunity, when a government em-

ployee is coerced, under threat of disciplinary action, to account for his activities while on the job, any statements he may make are inadmissible against him in any subsequent criminal proceedings. Nonetheless, the statements given can form the basis for suspending or discharging an employee if the employee has been adequately informed that the statements cannot be used against him in any criminal proceeding. Moreover, the employee's refusal to answer can form the basis for disciplinary action if he has been informed that use immunity has attached. (See *Gardner v. Broderick* (1968), 392 U.S. 273, 20 L. Ed. 2d 1082, 88 S. Ct. 1913; *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation* (1968), 392 U.S. 280, 20 L. Ed. 2d 1089, 88 S. Ct. 1917; *Garrity v. New Jersey* (1967), 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616.) Plaintiffs herein essentially raise two questions in this regard: first, whether an employer's attorney's admonishment that use immunity has attached is sufficient, and second, whether the firemen in this case were each adequately informed of the use immunity doctrine during the interrogation.

■■ ■ Plaintiffs argue that it was insufficient for defendants' counsel to advise of use immunity because there was no affirmative assurance from the prosecuting attorney of the pending criminal cases that none of the statements would be used against them. Therefore, plaintiffs assert there was no affirmative assurance of immunity. With regards to this argument, plaintiffs also question the propriety of allowing a copy of the transcript of the interrogation to be allowed into evidence on the basis they could not adequately cross-examine defendants' counsel as to whether he had been in contact with the prosecuting attorney about granting immunity. Plaintiffs' position is without merit. The Board allowed the transcript to be admitted into evidence as an exception to the hearsay rule on the premise that the transcript was not being offered to prove the truthfulness of its contents, but merely to show what questions were asked by Sorensen that plaintiffs refused to answer despite the warnings provided by Acting Fire Chief Frye and defendants' counsel. We agree with the Board's rationale and believe the transcript was properly admitted into evidence. Moreover, case law is clear that no affirmative assurance of immunity from the prosecuting attorney is required. (See *Erwin v. Price* (11th Cir. 1985), 778 F. 2d 668; *Gulden v. McCorkel* (5th Cir. 1982), 680 F. 2d 1070, *cert. denied* (1983), 459 U.S. 1206, 75 L. Ed. 2d 439, 103 S. Ct. 1194; *D'Acquisto v. Washington* (N.D. Ill. 1986), 640 F. Supp. 594.) Although there must be an affirmative assurance of immunity before an employer can compel statements, the cases "do not appear to specifically require a communication from the prosecutor. The employer, it

would seem, can do the advising." (*D'Acquisto*, 640 F. Supp. at 624.) The rationale is that use immunity attaches automatically as a matter of law and the statements cannot be used, regardless of whether immunity has expressly been granted. (*Erwin v. Price* (11th Cir. 1985), 778 F. 2d 668; *Gulden v. McCorkle* (5th Cir. 1982), 680 F. 2d 1070, *cert. denied* (1983), 459 U.S. 1206, 75 L. Ed. 2d 439, 103 S. Ct. 1194.) Nonetheless, employees under interrogation "are not expected to know the 'ins' and 'outs' of Fifth Amendment law, and they should not have to guess whether or not they have criminal immunity for their statements." (*D'Acquisto*, 640 F. Supp. at 624.) Thus, it was sufficient for defendants' counsel to inform plaintiffs their statements are inadmissible in court.

■ We also believe the timing of defendants' counsel's advice and the substance of his statement regarding use immunity were adequate. Plaintiffs argue that *D'Acquisto* and other cases require that the employee's statement regarding use immunity be given prior to any questioning whatsoever. We believe, however, that *D'Acquisto* and the cases cited therein merely require an assurance of use immunity before the employer can rightfully compel answers to its questions relating to an employee's official duties. Until the employer advises of use immunity, it cannot rightfully discipline an employee for refusing to answer the question pursuant to his fifth amendment rights. (See *Lefkowitz v. Cunningham* (1977), 431 U.S. 801, 53 L. Ed. 2d 1, 97 S. Ct. 2132; *Lefkowitz v. Turley* (1973), 414 U.S. 70, 38 L. Ed. 2d 274, 94 S. Ct. 316; *D'Acquisto*, 640 F. Supp. 594.) In the present case, questions were asked and answered prior to plaintiffs invoking their fifth amendment privileges. At that point defendants' counsel advised that the statements given were not admissible against them in court, and plaintiffs' counsel then acknowledged that he understood what the plaintiffs' constitutional rights were. From this point on, the employer had satisfied the use immunity requirement, and thus, plaintiffs' subsequent refusal to answer further questions subjected them to possible disciplinary action.

The next question to be addressed is whether the trial court erred in reversing the Board's decision to discharge plaintiffs based on their refusal to answer questions put to them by Sorensen after being directly ordered to do so under threat of disciplinary action and being admonished as to use immunity.

After the circuit court reversed the Board's findings against plaintiffs on counts 1, 2 and 3, the court remanded the cause to the Board for reconsideration of charge 4 and to invoke an appropriate sanction. The Board responded by discharging plaintiffs for insubordination as

outlined in charge 4. Plaintiffs appealed to the circuit court, and by order dated September 6, 1988, the court again remanded the cause to the Board with specific instructions to impose a sanction of "something less than discharge." The Board then responded by entering a decision and order dated October 31, 1988, wherein it imposed a 30-day suspension against plaintiffs and further directed that plaintiffs not be reinstated until the termination of any appeal or the expiration of time for filing such appeal. The Board clarified, however, that it was imposing this sanction "solely for the purpose of complying with the judge's order."

In its order of September 6, 1988, the circuit court determined the Board's decision of August 10, 1988, to discharge plaintiffs was "unreasonable, arbitrary, capricious, unrelated to the requirements of the service and against the manifest weight of the evidence." As support for its decision the circuit court stated:

"3. That the circumstances surrounding the conduct of the city's investigation mitigate the gravity of the offense for the following reasons:

(a) The questions propounded to the plaintiffs were asked by an investigator hired by the city and not by a superior officer.

(b) The record is unclear as to the authority of a private investigator in such circumstances and the obligation of the plaintiffs to respond to such questioning.

(c) The whole tenor of the city's investigation was more prosecutorial than investigative.

(d) no Fifth Amendment use immunity admonishment was given to plaintiffs until after certain questions had been asked and the Fifth Amendment privilege against self-incrimination asserted.

(e) That the city and commission had available previous statements given by each of the plaintiffs to a sheriff's deputy which stated in detail each of the plaintiffs' versions of their activities on the date and at the time and place in question.

(f) That each of the plaintiffs waived their Fifth Amendment rights against self-incrimination and testified at the administrative hearing conducted by the commission.

4. The record does not disclose any evidence of how the city's investigation was materially impeded by the plaintiffs' assertion of their Fifth Amendment rights, and the court finds that neither the city's investigation of the charges nor the conduct of the hearing before the commission was materially im-

peded thereby."

5. The court further finds that the plaintiffs' assertion of their Fifth Amendment rights with respect to the city's investigation was not willful or contumacious of either the city's investigation or of the administrative hearing, and did not amount to an obstruction of justice."

■ Our standard for review of the Board's decision to discharge plaintiffs for their refusal to answer questions posed by Sorensen is essentially the same as that of the circuit court. A reviewing court is authorized to overturn an agency's decision to discharge if it is "arbitrary, unreasonable or unrelated to the requirements of service." (*Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n* (1981), 85 Ill. 2d 547, 552, 426 N.E. 2d 885 (*DuFrenne*).) In essence, we must determine whether the agency's findings of fact provided sufficient cause for discharging plaintiffs, keeping in mind that the agency decision is entitled to substantial deference. See also *Kloss v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 252, 449 N.E. 2d 845.

It is undisputed that plaintiffs refused to respond to valid inquiries regarding their on-duty activities during the early morning hours of July 13, 1986. Defendants insist that Sorensen's investigation was impeded by plaintiffs' refusal to answer questions and this refusal, compounded by the seriousness of the pending charges against them, warranted discharge. Indeed Sorensen testified that plaintiffs' refusal to answer affected his investigation.

■ It is also undisputed, however, that at the time Sorensen interrogated plaintiffs, he had in his possession copies of plaintiffs' written statements previously given to Detective Wood detailing their version of the events that took place between midnight and 8 a.m. on July 13, 1986. It is also true that each plaintiff waived his respective fifth amendment right and testified at the administrative hearing. Although Sorensen may have had questions which were different than those posed by Detective Wood when he took the written statements, we concur with the circuit court that defendants have made no showing in this case that their investigation was materially impaired. Nonetheless, defendants had every right to conduct their own investigation into the events that transpired, and plaintiffs' refusal to cooperate in this effort after being given adequate warnings of the consequences cannot be taken lightly. We find no merit in the circuit court's finding that the admonishment given to plaintiffs occurred only after plaintiffs had invoked their fifth amendment privileges, because subsequent questions regarding the plaintiffs' activities during the time in

question were met with further resistance. We also find no merit in the trial court's finding that there was some question as to Sorensen's authority to conduct the investigation. A public employer has a right to an accounting from its employees, and constitutionally, the employee may be fired either on the basis of the answers or for refusing to answer. (*Lefkowitz v. Cunningham* (1977), 431 U.S. 801, 53 L. Ed. 2d 1, 97 S. Ct. 2132; *Gardner v. Broderick* (1968), 392 U.S. 273, 20 L. Ed. 2d 1082, 88 S. Ct. 1913; *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation* (1968), 392 U.S. 280, 20 L. Ed. 2d 1089, 88 S. Ct. 1917.) It should not be the court's responsibility to review each and every agency decision involving a public employee's refusal to account for his activities after proper admonishments have been given for the sole purpose of determining whether the employee's refusal to answer materially impaired the agency's investigation. Refusing to answer, despite being directly ordered to do so and after being advised of use immunity, is a serious violation which should not be tolerated. The agency should not have to rely on the investigation of some other authority, when that agency's credibility and accountability to the public are at stake. It was plaintiffs who chose not to testify, after being warned that their refusal to testify may result in their dismissal. The City of Peoria Fire Department merely kept its promise, and the plaintiffs must now live with their decision. The plaintiffs herein were not being discharged for invoking their fifth amendment rights; they were discharged for refusing to answer after being ordered to do so and after adequate use immunity admonishments were given. We therefore reinstate the Board's decision and order of August 10, 1988, discharging plaintiffs for insubordination as outlined in charge 4 and reverse the trial court's order of September 6, 1988, or any other order reversing the Board's decision to discharge plaintiffs for insubordination as outlined in charge 4.

The final issue is whether defendants filed a timely appeal to this court. Defendants' appeal was filed December 7, 1988. Plaintiffs contend that the time for filing appeals had lapsed because the 30-day time limitation began to run after the Board's decision and order of October 31, 1988. Essentially, plaintiffs argue the Board's decision of October 31, 1988, was final and appealable because it satisfied the circuit court's previous order of September 6, 1988, requiring the Board to discipline plaintiffs by something less than discharge and there was nothing more for the circuit court to act upon. Plaintiffs cite as authority *Kvidera v. Board of Fire & Police Commissioners* (1988), 168 Ill. App. 3d 380, 522 N.E. 2d 757. Defendants also cite *Kvidera* as authority for their position that the Board's October 31, 1988, decision

and order was not final and appealable and additionally cite *Mitrenga v. Martin* (1982), 110 Ill. App. 3d 1006, 443 N.E. 2d 268, and *Robinson v. Cook County Police & Corrections Merit Board* (1981), 93 Ill. App. 3d 1051, 418 N.E. 2d 170, as support.

In *Kvidera*, the agency found Kvidera guilty of various rules and regulations violations and suspended her as to two counts and discharged her as to a third count. On review, the circuit court affirmed the agency's factual findings but remanded the cause to the agency for imposition of "an appropriate lesser sanction." On remand, the agency affirmed its original decision, and the circuit court on review again reversed the decision. The agency then again reaffirmed its original decision and asked the circuit court to confirm its decision. The circuit court refused to confirm and again reversed the agency's decision as excessive, and the agency then appealed. Kvidera then also appealed the circuit court affirmance of the agency's factual findings. Both appeals were dismissed. The court determined that an order remanding a cause to the agency to impose a lesser sanction is not final and appealable, because the agency then needs to rule again on the appropriate sanction, which then gives either party the option of having the circuit court once again review the agency's subsequent sanction. The court indicated that in the absence of a contempt citation to force the agency to make a decision in accord with the court's order, the only way the circuit court's order becomes appealable is to either affirm the agency's decision or direct the agency to impose a specific sanction. Until such time, jurisdiction remains with the circuit court. *Kvidera*, 168 Ill. App. 3d 380, 522 N.E. 2d 757.

In *Mitrenga*, a police officer was discharged for departmental rule violations. The police officer appealed the decision to the circuit court, and the circuit court upheld the agency's findings of fact, but remanded the discharge issue, ordering the agency to "consider an alternative sanction to that of discharge," pursuant to authority granted by the Illinois Code of Civil Procedure section 3—111(a)(6) (Ill. Rev. Stat. 1987, ch. 110, par. 3—111 (a)(6)). (*Mitrenga*, 110 Ill. App. 3d at 1007.) The agency then appealed rather than consider a different sanction. The appeal was dismissed on the basis that the circuit court's order was interlocutory in nature, and thus, not final and appealable. The court basically used the same logic as *Kvidera* for dismissing the appeal, but further stated:

> "Where the circuit court has the power to remand an agency decision for further hearings or proceedings, we feel that jurisdiction must necessarily remain with the circuit court until after disposition of these further matters. Only after the circuit

court has examined the results of these additional proceedings will we recognize its subsequent order as being final and appealable." *Mitrenga*, 110 Ill. App. 3d at 1008.

In *Robinson*, a police officer was discharged for rule violations. The police officer appealed to the circuit court, which affirmed the agency's finding of fact but remanded the matter for reconsideration of the discharge sanction "in light of [the circuit] court's opinion that said sanction is unduly harsh." (*Robinson*, 93 Ill. App. 3d at 1052.) On remand, the agency affirmed its original decision to discharge, and the police officer appealed directly to this court. On its own motion, the court raised the issue of jurisdiction and dismissed the appeal, stating "plaintiff has omitted one crucial procedural step because plaintiff did not again present the Merit Board's final order to the circuit court." (*Robinson*, 93 Ill. App. 3d at 1052.) The court then went on to compare the circuit court's jurisdiction to that of the circuit court in workers' compensation situations, where the court remands a matter to the Industrial Commission for modification. The Industrial Commission must then act on the order and it must then be confirmed by the circuit court before it becomes final and appealable. *Robinson*, 93 Ill. App. 3d 1051, 418 N.E. 2d 170.

Plaintiffs assert that *Kvidera*, *Mitrenga* and *Robinson* are not procedurally analogous to the present case because in each of those cases the agency refused to comply with the court's direction to impose a lesser sanction than discharge. In the present case, however, the Board did impose a lesser sanction than discharge; thus, there was nothing left for the court to review. Plaintiffs then argue that *Kvidera* stands for the proposition that if the court orders a lesser sanction and the Board complies, the Board's decision does not then require a confirmation from the court before it becomes an appealable issue. We disagree. *Kvidera* states that an order becomes appealable in three situations: if there is a contempt citation filed to enforce a court's order directing the agency to somehow modify a previous order; if the trial court affirms an agency decision to the dissatisfaction of one or more parties; or if the circuit court reverses a decision and directs the board to impose a specific sanction and the board appeals. The underlying question is, therefore, whether the trial court's order of September 6, 1988, was substantially specific so as to be considered final and appealable. The order specifically directs the Board to "impose a penalty of something less than discharge." This language is similar in nature to the terminology used by the circuit court in *Kvidera* ("an appropriate lesser sanction") (*Kvidera*, 168 Ill. App. 3d at 381) and *Mitrenga* ("to consider an alternative sanction to that of dis-

charge") (*Mitrenga*, 110 Ill. App. 3d at 1007) and therefore is insufficient to be considered final and appealable. Although *Kvidera*, *Mitrenga* and *Robinson* are not exactly identical, in that the agency in each case merely refused to comply rather than comply under protest as the Board did here, each case contemplates the situation and states that the agency's compliance with the circuit court's direction must then again be confirmed by the circuit court. The circuit court's affirmance of its September 6, 1988, order in the present case did not arise when the board complied with its direction in October 31, 1988, but when the circuit court confirmed that its previous direction had been complied with by order dated December 7, 1988. Thus, plaintiffs' appeal has been timely filed.

■■■ Plaintiffs lastly argue that defendants' request for administrative review resulting in the December 7, 1988, order was technically insufficient in form and was without service of summons on plaintiffs. We reject plaintiffs' arguments. Plaintiffs generally appeared by filing a response to request for administrative review, thereby waiving service of summons. Plaintiffs further filed no motion to dismiss the request for review as technically insufficient, and therefore, this argument was also waived.

In summary, we affirm the circuit court's decision reversing the Board's findings against each plaintiff as to charges 1,2, and 3; affirm the circuit court's affirmance of the Board's findings against each plaintiff as to charge 4; reverse the trial court's reversal of the Board's decision to discharge each plaintiff based on the Board's findings as to charge 4 and reinstate the Board's decision; and consider the appeal timely filed. We need not decide whether the Board had authority to suspend plaintiffs during the pendency of this appeal.

Affirmed in part and reversed in part.

WOMBACHER, P.J., and STOUDER, J., concur.