# Illinois Official Reports

## Appellate Court

---

**Woods v. City of Berwyn, 2014 IL App (1st) 133450**

---

| | |
|---|---|
| Appellate Court Caption | JOHN MICHAEL WOODS, Plaintiff-Appellant, v. THE CITY OF BERWYN, THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF BERWYN, BERWYN FIRE DEPARTMENT, FIRE CHIEF DENIS J. O'HALLORAN, RALPH REYNA, Commissioner, ROGER MONTORO, Commissioner, and RICHARD TOMAN, Commissioner, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-13-3450 |
| Filed | October 29, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a decision of defendant board of fire and police commissioners to discharge plaintiff from his position as a fire lieutenant for making threats against his superiors, the appellate court upheld the board's decision, since the collective bargaining agreement did not give plaintiff the right to arbitration, the board did not violate plaintiff's rights by hearing the charges, and the board's factual findings, including the decision to reject plaintiff's theory that he was being framed by a fellow lieutenant, were not against the manifest weight of the evidence and supported the decision to discharge plaintiff. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2011-CH-32916; the Hon. Neil H. Cohen, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Golan & Christie, LLP, of Chicago, and Harry C. Lee, of Law Office of Harry C. Lee, of Chicago, for appellant.

Joseph M. Gagliardo and Jeffrey S. Fowler, both of Laner Muchin, Ltd., of Chicago, for appellees.

Panel

JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff John Woods appeals the decision of defendant Board of Fire and Police Commissioners of the City of Berwyn (the Board) discharging him as a fire lieutenant. Woods' discharge stems from certain threats he allegedly made against superiors. He argues that: (i) his due process rights were denied when he was not allowed to arbitrate his grievance; and (ii) the decision to terminate was against the manifest weight of the evidence. We disagree and affirm, finding that conditions precedent to arbitration were not satisfied, that the Board's findings were not against the manifest weight of the evidence, and that its decision to terminate was reasonable.

¶ 2                                   BACKGROUND

¶ 3    Woods began working for the Berwyn fire department in 1988. He was promoted to fire lieutenant in 2008. Woods had a clean disciplinary record until 2009, when he received a 24-hour suspension without pay for a confrontation with a firefighter to whom Woods said, "You stay out of my life." The firefighter asked Wood's three times, "Is that a threat?" Woods answered, "Yeah, leave me alone."

¶ 4    In October 2010, Woods volunteered to become the department's training officer. But, over time, he felt he received inadequate training for the job and that his superiors were overly critical of his work. He described his supervisors' treatment as "harassment."

¶ 5    In mid-May 2011, Deputy Chief Sam Molinaro spoke to Woods at a pub. Woods told Molinaro that he was extremely stressed about his job, and the stress was starting to affect his family life. Molinaro advised Woods to speak to the fire chief and request a reassignment. He also told him that, with 14 new firefighters in the department, it was important that Woods did his job well. Woods responded he could handle the job, but insisted his superiors picked on him.

¶ 6    By month's end, Woods changed his mind. He met with Assistant Chief Dick Swade and Chief Denis O'Halloran. The chief asked Woods whether he wanted to remain in the training officer position. Woods said, "No, I do not." Woods further stated that he was tired and not sleeping, and would go home at night, sit in his chair, and have "bad thoughts." The chief told Woods, "Okay, you're out."

¶ 7    As a result of the meeting, a 14-day notice was posted seeking a lieutenant to take over the training officer vacancy, and if no lieutenant volunteered, the most junior lieutenant would be

assigned the job. Lieutenant Ronald Hamilton was the most junior lieutenant in the department. The chief discussed the prospect of becoming the training officer with Hamilton, and Hamilton was not happy.

¶ 8 A few days later, Woods met with his supervisor, Deputy Chief Greg DiMenna, to turn in lesson plans. The deputy chief complimented Woods on his work, and Woods responded saying he wanted to continue as training officer. The deputy chief said he would ask his superiors if Woods could stay on as training officer. The deputy chief asked the chief whether Woods could remain in his position, and the chief said, "Absolutely not." The deputy chief did not tell Woods the chief's response.

¶ 9 On June 3, 2011, Lieutenant Hamilton was on duty at the south end firehouse in Berwyn. While returning from a call, Hamilton saw Woods on the firehouse driveway. Woods and Hamilton were friends, having socialized a number of times outside of work. Woods asked Hamilton to talk. According to Hamilton, Hamilton started the conversation, saying, "Mike [Woods], you have a good heart. You have a heart of gold, but you never take responsibility for your actions." Woods asked, "What do you mean?"

¶ 10 Hamilton responded, "Because of you not doing your job, it doesn't just affect you now. If nobody signs the transfer sheet to go into the training office, it's going to be me going in there, and I just want you to know that it does affect me and my family also." As a fire lieutenant, Hamilton worked 24-hour shifts followed by 48 hours off. The training officer works from 7 a.m. to 3 p.m., Monday through Friday.

¶ 11 Woods said he felt everyone was out to get him and nobody helped him in his job. He mentioned an incident where the deputy chief's wife got his wife fired. Then he said, "I'd like to kill them. Kill them all." Woods also said that his children wanted "addresses" so they could go "tune them up." Hamilton assumed "them" referred to the fire department management. Hamilton said, "Mike, you know that sounds crazy, right? Your kids, there's no way they can get away with that." Woods later said that he sometimes sat at home thinking of ways of hurting himself, and he thought he needed psychiatric help.

¶ 12 Woods recollected the conversation differently. Hamilton started the conversation, saying, "Mike, shut up. I want you to keep your mouth shut and let me talk." Hamilton said, "Mike, you always got an excuse for everything." Woods asked for an example. Hamilton could not provide one, but told Woods that he was going to ruin Hamilton's family life and financial position. "You screwed up your life, now you're screwing up mine," Hamilton said, according to Woods, "I won't be able to do my job. I won't be able to spend time with my family."

¶ 13 Woods told Hamilton that he had spoken with Deputy Chief DiMenna and was going to try to stay in the training officer position. Woods did not know that the chief had already rejected his request. Woods said, "Relax. Everything will work out." Woods also said that he might stay in the training officer position until another lieutenant retires so that Hamilton would not be the most junior candidate. Hamilton asked, "Did you tell [Chief] O'Halloran that?" Woods responded, "No. That was [Deputy Chief] Greg DiMenna's job." Woods told Hamilton that everything would be fine, shook his hand, and left. He denied that he threatened anyone or said that he wanted to hurt himself.

¶ 14 Bothered by the conversation, Hamilton called the vice president of the union and told him about what Woods had said. The vice president advised him to call the union president, who told Hamilton to tell Deputy Chief Molinaro. The deputy chief asked Hamilton to prepare a written statement, which he did, and told the chief and assistant chief about Hamilton's

conversation with Woods. The chief placed Woods on administrative leave. He also asked the Berwyn police to check on Woods. Woods told the police he did not threaten anyone and had no intention of harming himself or others.

¶ 15    As part of the fire department's investigation, the deputy chief questioned Woods on June 5. Woods denied threatening anyone. A few days later, the chief ordered Woods to undergo a psychological evaluation. The psychologist reported that Woods "denied that he had made such threats to any person *** we did judge him to be honest and forthcoming in the evaluation." The psychologist found no evidence of a major psychiatric disorder and concluded Woods was capable of returning to work.

¶ 16    In July 2011, the chief filed charges against Woods before the Board of Fire and Police Commissioners of the City of Berwyn, which included: (i) conduct unbecoming of a firefighter; (ii) fighting and verbal abuse; (iii) providing false information; and (iv) violation of the law. Woods responded with a grievance and requested to proceed before a labor arbitrator. The union voted not to refer Woods' grievance to arbitration. Hamilton, a member of the union's executive board, abstained from the vote.

¶ 17    Regarding disciplinary action, the collective bargaining agreement between the city and union, at section 9, provided that while the fire chief and the Board had various statutory authority over employees, nevertheless section 9 supplemented the fire chief and Board's authority "by providing non-probationary employees with the right to choose between having a dispute as to disciplinary action resolved through a hearing before an arbitrator selected according to the grievance/arbitration procedure of this agreement or by hearing conducted by the Board." The section then sets out the grievance procedure, including, "If no grievance is filed or the Union does not refer the grievance to arbitration, the charges shall proceed to hearing and determination shall be made by the Board."

¶ 18    In August 2011, the Board held a hearing on the fire chief's charges. At the hearing, Woods' counsel raised the issue of his right to arbitrate under the collective bargaining agreement. Counsel admitted that the union had disallowed Woods' grievance, but noted that, "By participating in the hearing against Lieutenant Woods' wishes, because he wants to arbitrate, we're not waiving any rights to litigate federal claims or any other state law claims. We're only litigating this issue of disciplinary charges brought by the department." Woods then participated in the hearing.

¶ 19    The Board found that the chief met his burden of establishing, by a preponderance of the evidence, that Woods was guilty of the charges and that there was cause for his termination. Woods sought an administrative review of that ruling in the circuit court. The circuit court remanded the case to the Board to make factual findings. The Board made factual findings, crediting Hamilton's testimony and noting that Woods had a motive to be "less than truthful." Woods again sought administrative review from the circuit court, and the circuit court upheld the Board's decision. This appeal followed.

¶ 20                                                            ANALYSIS

¶ 21    Woods argues: (i) the Board's refusal to arbitrate violated his due process rights under the Illinois Municipal Code (65 ILCS 5/1-1-1 *et seq.* (West 2010)) and the collective bargaining agreement; (ii) the Board's findings were against the manifest weight of the evidence; and (iii) the Board's decision to terminate Woods was not supported by the evidence.

Whether a party's procedural due process rights were violated presents a legal question, which we review under the *de novo* standard. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004).

The Illinois Municipal Code provides that a firefighter may not be discharged without notice and a hearing, or impartial arbitration if so provided under a collective bargaining agreement. 65 ILCS 5/10-2.1-17 (West 2010). A collective bargaining agreement is a contract, and as such, we interpret it consistent with the plain meaning of its terms. *Board of Education of Du Page High School District No. 88 v. Illinois Educational Labor Relations Board*, 246 Ill. App. 3d 967, 975 (1992). The law creates a presumption in favor of arbitrating disputes under collective bargaining agreements that contain arbitration clauses and, when in doubt, courts favor arbitration. *Champaign Police Benevolent & Protective Ass'n Unit No. 7 v. City of Champaign*, 210 Ill. App. 3d 797, 802 (1991). But, where a collective bargaining agreement establishes a grievance and arbitration procedure, those procedures are the exclusive mode of redress for enforcing the employment contract unless the parties expressly agree otherwise. *Meeks v. South Bend Freight Lines, Inc.*, 85 Ill. App. 3d 755, 758 (1980).

The collective bargaining agreement applicable to Woods provides "non-probationary employees with the right to choose between having a dispute as to disciplinary action resolved through a hearing before an arbitrator selected according to the grievance/arbitration procedure of this agreement or by hearing conducted by the Board." The agreement sets forth the following procedure for arbitration: (i) when the fire chief files charges with the Board, he must give notice to the effected employee and the union; (ii) the employee or the union may then "file a grievance contesting the just cause of the disciplinary action" within a certain period of time; and (iii) the grievance "may be referred to arbitration."

The collective bargaining agreement further states, "[i]f the grievance is referred to arbitration *by the Union*" certain conditions must be fulfilled, including a signed statement from the accused waiving all rights to a hearing before the Board. (Emphasis added.) "If no grievance is filed *or* the Union does not refer the grievance to arbitration, the charges shall proceed to hearing and determination shall be made by the Board." (Emphasis added.)

These procedures create a condition precedent to arbitration–the union must refer a grievance to arbitration. See *Amalgamated Transit Union, Local 900 v. Suburban Bus Division of the Regional Transportation Authority*, 262 Ill. App. 3d 334, 338 (1994) ("A condition precedent is one which must be performed either before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform."). The collective bargaining agreement sets forth several steps before arbitration: the fire chief must file charges with the Board, then the affected employee may file a grievance. The union must then decide whether to refer the grievance to arbitration. Woods filed a grievance in response to the fire chief's charges, but the union declined to refer his grievance to arbitration. Accordingly, a condition precedent to arbitration was not met, and the Board did not err in proceeding to hear the charges against Woods.

Woods argues that his right to arbitration is unconditional. He points to the language in the collective bargaining agreement intending to give "non-probationary employees *** the right to choose" between arbitration and a hearing before the Board. But the plain meaning of the collective bargaining agreement belies Woods' reading. We must read the agreement as a

whole. *Speed District 802 v. Warning*, 242 Ill. 2d 92, 136 (2011). And Woods' interpretation makes the procedures set out in the agreement surplusage.

¶ 29    The agreement sets out two steps before arbitration: first, a grievance filed by the employee, and second, a referral of the grievance to arbitration "by the Union." If the union refers the grievance to arbitration, the union must give notice and include a waiver of the employee's right to a Board hearing. The matter then goes to an impartial arbitrator. The collective bargaining agreement does not provide for an employee to directly refer a grievance to an arbitrator. If the union and the city wanted to allow an employee–without union approval–to take a grievance to arbitration, the collective bargaining agreement would have said so. While the collective bargaining agreement often uses the passive voice in the arbitration provisions ("If the grievance is filed, it may be referred to arbitration"; "If the grievance is referred to arbitration by the Union"), reading the provisions as a whole, it is clear the decision to arbitrate a grievance belongs to the union alone.

¶ 30    Woods further argues that he may refer his grievance to arbitration under the clause stating, "If no grievance is filed or the Union does not refer the grievance to arbitration," the Board shall hear the charges. Woods is essentially turning the clause inside out so it in effect reads, "If a grievance is filed or the Union refers the grievance to arbitration, then the Board shall not hear the charges." Under the clause, contrary to Woods' misreading, if either of the conditions precedent to arbitration (grievance or union referral) is not present, then the Board hears the charges.

¶ 31    Accordingly, Woods had no right to arbitration under the collective bargaining agreement and suffered no due process violation when the Board proceeded to hear the charges against him.

¶ 32                            The Board's Factual Findings

¶ 33    Woods next argues that the Board's factual findings–that (i) Woods threatened his supervisors and their families; and (ii) Hamilton testified consistently and credibly–are against the manifest weight of the evidence. We disagree.

¶ 34    We review the findings of the Board under the manifest weight of the evidence standard, and will reverse only if the opposite conclusion is clearly evident from the evidence as a whole. *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 210 (2006); *Blunier v. Board of Fire & Police Commissioners*, 190 Ill. App. 3d 92, 102 (1989) ("A review of the entire record is required in order to determine whether the manifest weight of the evidence, as a whole, warrants a different conclusion ***."). Generally, if the record contains evidence to support the findings and decision, we will affirm. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 35    The Board's decision to terminate Woods turns on Hamilton's testimony. Hamilton testified that Woods said he wanted to kill his superiors and that Woods' sons wanted to hurt their families. Woods denied saying anything of the sort. That the Board chose to believe Hamilton and disbelieve Woods is not contrary to the manifest weight of the evidence. See *Taylor v. Police Board*, 62 Ill. App. 3d 486, 492 (1978) (holding reliance on conflicting testimony does not provide basis for reversal).

¶ 36    Woods points to numerous weaknesses in Hamilton's testimony, including: (i) discrepancies between his testimony and his written statement made soon after the incident;

- 6 -

(ii) Hamilton's failure to immediately report Woods' threat to fire department management or police, instead calling the union; and (iii) Hamilton's motive to lie and frame Woods so that Hamilton would not have to become the department training officer. Woods also points to aspects of his own testimony that bolster his credibility and show he was not a threat, namely, (i) after allegedly threatening fire department management, he went home to his family; (ii) the police who visited Woods the night of the incident did not arrest him or even warn him; and (iii) a psychologist believed that Woods was not a threat to himself or others.

¶ 37 Inconsistencies are bound to occur in testimony due to the passage of time, which affects perceptions and memories. All the inconsistencies cited by Woods in Hamilton's testimony are minor and none indicate Hamilton fabricated his version of the conversation with Woods. See *Feliciano v. Illinois Racing Board*, 110 Ill. App. 3d 997, 1004 (1982) (holding assessment of credibility is for trier of fact who observed testimony and reviewing court will not reverse assessment without something more than mere conflicting testimony); *People v. Talach*, 114 Ill. App. 3d 813, 820 (1983) (minor inconsistencies in testimony do not destroy credibility and any variations in testimony for trier of fact to weigh). Accordingly, the Board's decision to credit Hamilton's testimony is not against the manifest weight of the evidence.

¶ 38 Woods also notes that Hamilton had motive to lie, namely, to frame Woods so that Hamilton would not have to become the new training officer. Woods' theory is one that the Board heard and rejected. During closing arguments, Woods argued that Hamilton had a motive to fabricate Woods' threat. While Hamilton's motive does cast a pall on his version of the facts (see *People v. Herman*, 407 Ill. App. 3d 688, 705 (2011)), it was for the Board to determine how his motive affected the weight of his testimony. See *Hurst v. Department of Employment Security*, 393 Ill. App. 3d 323, 329 (2009) ("It is the responsibility of the administrative agency to weigh the evidence, determine the credibility of witnesses, and resolve conflicts in testimony."); *Gregory v. Bernardi*, 125 Ill. App. 3d 376, 383 (1984) ("if the issue is merely one of conflicting testimony and credibility of a witness, the agency's determination should be sustained").

¶ 39 Thus, the Board's factual findings are not against the manifest weight of the evidence.

¶ 40 The Board's Decision to Terminate

¶ 41 Woods next argues that defendants failed to demonstrate just cause for his discharge. We disagree. We will not reverse the Board's decision to discharge an employee unless it is arbitrary, unreasonable, or unrelated to the requirements of service. *Krocka v. Police Board*, 327 Ill. App. 3d 36, 46 (2001).

¶ 42 "Cause" refers to some substantial shortcoming that makes an employee's continued employment detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as good cause for the employee no longer occupying the office. *Carrigan v. Board of Fire & Police Commissioners*, 121 Ill. App. 3d 303, 311 (1984). "[A] single instance of misconduct can constitute cause for discharge where the misconduct is serious." *Hermesdorf v. Wu*, 372 Ill. App. 3d 842, 853 (2007).

¶ 43 Woods told Hamilton that he "would like to kill them," "[k]ill them all" and that his sons wanted to "tune them up," referring to the fire department's managerial staff and their families. The Board found that this statement constituted a threat against fire department personnel and provided cause for Woods' termination. A reasonable conclusion. Not only do threats undermine the public's confidence in a firefighter's good judgment and maturity (*cf. Walsh v.*

*Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 106 (1983) (holding unnecessary display of firearm reflected poorly on ability and good judgment of police officer)), but, also, allowing the firefighter to remain on the job may erode the discipline and efficacy of the service, lowering morale and fostering distrust among the ranks. The city need not wait until that threat manifests as serious violence before seeking a discharge. *Cf. Williams v. Illinois Civil Service Comm'n*, 2012 IL App (1st) 101344, ¶¶ 12-13 (upholding discharge for frustrated employee's minor act of violence).

¶ 44    Woods further argues that evidence cannot sustain the four charges pressed against him. A finding of guilt under any of the charges would provide sufficient basis for removal. See *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 100 (noting guilty finding on any minor charges provides basis for suspension).

¶ 45    As to the second charge, "fighting/verbal abuse," the rules bar a member of the department from engaging "in fights or verbal disputes." There is no evidence that Woods and Hamilton fought or engaged in a verbal dispute. As to the fourth charge, violation of the law, the Board did not find that Woods violated any law. Accordingly the evidence did not support a finding of guilt under that charge.

¶ 46    Nevertheless, Woods' guilt under the first and third charges is sufficient to uphold his discharge. The department's rules and regulations define the first charge, "conduct unbecoming," as a breach of "the ordinary rules of good behavior observed by law-abiding citizens." Woods' expression of a desire to kill his supervisors is conduct unbecoming of a fire lieutenant. Woods' guilt under the third charge, making a false report about a matter related to the department, flows from denials he made during the fire department's official investigation. The Board's finding that Woods lied about his statements to Hamilton supports a guilty finding under the third charge.

¶ 47    The evidence well supports the Board's decision to remove Woods.

¶ 48    Affirmed.